Lester W. BREESE, As Administrator of the Estate of Jerry W. Breese, Deceased, Appellant (Plaintiff Below),

v.

STATE of Indiana d/b/a LaRue D. Carter Memorial Hospital, Appellee (Defendant Below).

No. 2–880A283.

Court of Appeals of Indiana, Second District.

May 31, 1983.

Rehearing Denied June 29, 1983.

William J. Norton, Anderson, for appellant.

Linley E. Pearson, Atty. Gen., Frederick N. Kopec, Deputy Atty. Gen., Indianapolis, for appellee.

SULLIVAN, Judge.

Jerry Breese, while a patient at LaRue Carter Hospital, committed suicide by hanging himself. He was survived by a minor child.

Lester Breese (Breese), Administrator of the Estate of his son, Jerry Breese, appeals the judgment entered on a jury verdict for Defendant-Appellee, the State of Indiana d/b/a LaRue D. Carter Memorial Hospital (hereinafter LaRue Carter), on Counts I (negligence) and III (breach of contract) of Breese's wrongful death complaint. Breese also appeals the court's Judgment on the Evidence in favor of LaRue Carter on the second count (res ipsa loquitur) of his complaint.

The issues before us involve admission and exclusion of evidence, the giving and refusal of instructions and the granting of defendant's motion for judgment on the evidence as to the res ipsa loquitur count of the complaint.

We reverse and remand for a new trial upon Counts I and III of the complaint. For this reason we feel constrained to deal with issues which are likely to be presented upon retrial.

## FACTS

On October 10, 1973, Jerry Breese (Jerry), age 27, was admitted to Community Hospital in Anderson, Indiana, after he was found in a supermarket parking lot screaming and beating his fists on his car. During his second day at Community Hospital, Jerry cut himself on the stomach with a piece of broken glass. When they were told by hospital personnel that Community did not have the facilities to watch Jerry continuously, Breese and his wife arranged to have friends and relatives stay with him around the clock for the remainder of his nearly two-week stay there. After the incident with the glass and while still at Community, Jerry tried to jump out of a window and tampered with an electrical outlet in his room.

Breese testified at trial that Jerry's treating physician at Community Hospital told him that Community did not have the facilities necessary to deal with Jerry's psychiatric condition, which was diagnosed as "Catatonic Reaction and Reactive Depression." Record at 451. Jerry was transferred to Methodist Hospital in Indianapolis on October 24, 1973. Breese testified that he accompanied Jerry during his transfer by ambulance to Methodist Hospital, and that during this transfer, Jerry grabbed a pair of scissors and held them until Breese asked that he give them to him. Breese stated that when they arrived at Methodist he informed admitting personnel about the scissors incident and Jerry's behavior at Community Hospital.

Jerry was initially diagnosed at Methodist as "acute schizophrenic on schizo affective reaction with catatonic and depressive manifestations." Record at 445, Plaintiff's Exhibit No. 1. While at Methodist, Jerry continued his suicidal gestures: on November 5, he was found in his room with his belt around his neck "apparently trying to figure out a way to hang himself" (Record at 454, Plaintiff's Exhibit No. 1, statement by Dr. Ronald Hull—Jerry's treating psychiatrist at Methodist) and the Nurse's Clinical Record relates the following incidents: On November 7, he checked a fellow patient's crochet needle for sharpness; on November 8, he was found with a broken plastic spoon; on November 10, after eating, he attempted to keep his knife; and medication was found in his clothing on November 13, and in his room on November 14 and 15. On November 15, he also broke a window in his room and cut his elbow superficially. On the 16th it was noted that Jerry "still tries to palm pills." On November 19 he superficially cut his wrist with a

table knife, and reopened the wound the next day with a broken plastic spoon. On the 20th Jerry also removed a spring from his bed and refused to give it to hospital personnel, and on November 25th he attempted to take a fork with him from dinner.

After Jerry had been at Methodist about a month, he was temporarily committed to LaRue Carter because his insurance coverage was about to run out and there were no other resources for his continued treatment at Methodist. He was transferred to LaRue Carter on November 26, 1973.

Donald F. Moore, M.D., Medical Director at LaRue Carter and Professor of Psychiatry at Indiana University School of Medicine, testified that personnel at LaRue Carter were made aware that Jerry had exhibited suicidal behavior while at Methodist by a statement in a "transfer record" and a phoned request for admission. The "transfer record" referred to was a single sheet of paper entitled "Request for Continuity of Care Form," which contained the following statement: "Persistent suicidal behavior— recommend full precautions." Record at 212, 779.

Lester Breese testified that during Jerry's admission to LaRue Carter, he told hospital personnel seven or eight times about his son's suicidal gestures or attempts at Methodist and Community Hospitals, including the incident when Jerry was found with a belt around his neck. Breese stated that he offered to arrange to have friends and relatives watch Jerry continuously if the staff could not properly watch him, but was assured that LaRue Carter could do so. In answer to Breese's Request for Admissions, LaRue Carter admitted that Lester Breese had informed one or more hospital employees of certain of Jerry's suicidal acts.

Marvin Miller, M.D., Jerry's admitting and treating physician at LaRue Carter, diagnosed him as "paranoid, schizophrenic and suicidal" and ordered suicidal precautions for him which entailed, *inter alia,* placing him in a double room and observing

him at 15 minute intervals. Dr. Moore testified that during the day of his admission, Jerry was "quite cooperative" and at one point in conversation with Dr. Miller, seemed "almost optimistic." However, in a document entitled "Clinical Record and Final Summary, Admission Mental Status," Dr. Miller reported that:

> "The patient was quite anxious, fidgeting around in the chair throughout the interview. At times he would raise his voice quite abruptly to an anxious whine. Throughout most of the interview there was a flat facial feature and flat tone of voice.... The patient's insight and judgment were both felt to be poor." Record at 346–347, Plaintiff's Exhibit 2.

Dr. Moore testified that, according to his review of the Clinical Record, after Jerry was admitted to his ward, he ate well, talked with ward personnel and other patients, and took his medication without objection, but Reverend Earl Moore, who had previously visited Jerry at Methodist, testified that when he tried to visit Jerry at LaRue Carter, and was told to leave by an orderly, Jerry seemed "kinda wild eyed." Record at 339.

In the Clinical Record, a ward nurse noted that when Jerry went to his room after dinner he had a "strange look" on his face. When she went to check on him, he was lying in bed apparently asleep. Approximately ten minutes later, Jerry was found hanging from a closet door with a belt tied around his neck. Ward personnel unsuccessfully attempted to revive him, and summoned Dr. Smith, the physician on call. Further attempts to revive Jerry were unsuccessful and he was transported to Marion County General Hospital where he was pronounced dead approximately one-half hour after arrival.

Lester Breese brought a wrongful death action, as Administrator of Jerry's estate, against LaRue Carter and seven other defendants.[1] Count I of the complaint alleged that Jerry's death was caused by LaRue

---

1. Counts IV–XI of the complaint involved other defendants. In proceedings not relevant to this appeal, all claims against the other defendants were dismissed prior to trial.

Carter's failure to properly guard and restrain him; Count II alleged liability based upon the doctrine of res ipsa loquitur; and Count III alleged that LaRue Carter had breached its contract to guard, care for or protect decedent.

Resolution of the issues is complicated by the fact that certain evidence and instructions are arguably relevant and appropriate to some aspects of the case but are improper considerations with respect to others.

The trial involved a claim that LaRue Carter was negligent in failing to guard and protect Breese against his own self destructive conduct. A separate count of the complaint, however, was couched in terms of breach of contract and asserted, *inter alia,* that LaRue Carter failed to "care for" the patient. The difficulty is particularly salient with respect to evidence that LaRue Carter did not provide or utilize available suction equipment which, it is asserted, may have saved Breese *after* his suicidal act.

Our determination on the various issues presented, therefore, depend in part upon whether one is considering the conduct of LaRue Carter as it relates to the suicidal act of Breese or whether one views the case as a failure to adequately "care for" the patient after the suicidal incident which culminated in his death.

## I.

### DUTY OF REASONABLE CARE

At the outset it is appropriate to consider the duty owed by a mental hospital to a patient who has exhibited suicidal tendencies and the standard by which it is necessary to measure the hospital's conduct in relationship to the duty. Such consideration is perhaps most germane with regard to certain instructions given or tendered and refused.

Breese argues that the trial court erred in refusing to instruct the jury as requested in his tendered instruction # 7, which stated:

"You are instructed that when a mental hospital which accepts a patient knows or is put on notice of a patient's suicidal tendencies, that hospital, its agents and employees, are required not only to use reasonable care in treating the patient for his illness, but also to safeguard him from self-inflicted injury or death. This duty is proportionate to the patient's needs, that is, such reasonable care and attention as the patient's known mental condition and the known methods he has used in previous suicide attempts requires."

In determining whether the refusal of a tendered instruction was erroneous, we necessarily consider whether the tendered instruction correctly states the law.

The duty of a mental hospital to exercise reasonable care in the *treatment* of a patient with known suicidal tendencies is not disputed. LaRue Carter argues that Breese's tendered instruction would have informed that jury that a mental hospital is required *not only* to use reasonable care in treating the patient for his illness, but also to safeguard him from self-inflicted injury or death, and that there is no basis in Indiana law for extending a mental hospital's duty beyond that of reasonable care. We disagree with LaRue Carter's assertion that the tendered instruction extends the requisite standard.

Breese's tendered instruction # 7 does not place a duty upon a mental hospital to *insure* that a patient does not commit suicide; rather it would have informed the jury of the hospital's obligation to use reasonable care in performing two distinct functions: in treating the patient's illness, and in safeguarding the patient from self-inflicted injury or death. In addition, the tendered instruction would have informed the jury of the effect that the hospital's knowledge of Jerry's prior suicide attempts and methods used had upon its duty to exercise reasonable care. In this connection however, the phrase "reasonable care" is better used in close proximity to the statement of the duty "to safeguard."

The existence of a duty to use reasonable care in safeguarding mental patients with suicidal tendencies was recognized by this Court in *Fowler v. Norways Sanitorium* (1942) 112 Ind.App. 347, 42 N.E.2d 415, discussing the duty owed to a suicidal patient

respectively by the treating physician (an independent contractor) and the hospital. The Court characterized the physician's duties of diagnosis and treatment as "medical acts" and the institution's duties of "care, protection and customary hospitalization" as "administrative or ministerial acts." 112 Ind.App. at 356–57, 42 N.E.2d at 419. The Court stated:

"While a hospital or sanitorium conducted for private gain is not an insurer of its patients against injuries inflicted by them, it is required to use ordinary care in the treatment and care thereof. *In determining ordinary care in such cases it is proper to consider the physical and mental ailments of the patient which may affect his ability to look after his own safety.*" 112 Ind.App. at 354, 42 N.E.2d at 418 (citations omitted; emphasis supplied).

It follows that if a hospital has knowledge or notice of prior suicide attempts, and the methods or instrumentalities the patient could be expected to utilize, the foreseeability of self-inflicted injury increases. *See Paulen v. Shinnick* (1939) 291 Mich. 288, 289 N.W. 162.

■ Notwithstanding our rejection of LaRue Carter's objection to the instruction, our inquiry does not end, for we observe that the instruction nevertheless does not correctly state the law. The instruction erroneously states that the *duty* of reasonable care "is proportionate to the patient's needs." The duty in question is always that of reasonable care. It does not change. But that duty is always viewed in the light of the particular circumstances present. Thus the conduct required to meet that standard of care may vary from case to case according to the circumstances. *Walters v. Kellam & Foley*, (2d Dist.1977), 172 Ind. App. 207, 360 N.E.2d 199. The instruction was appropriately refused.

## II.

## MINISTERIAL ACTS AS OPPOSED TO MEDICAL ACTS AND NECESSITY FOR EXPERT TESTIMONY

Breese next argues that the trial court erred in giving its final instructions 6 and 7, and in its refusal to give Breese's tendered instruction 18. The court's instructions stated:

"(6) Negligence on the part of a Doctor or a Nurse is the failure of such Doctor or Nurse to exercise that degree of reasonable or ordinary care and skill in the diagnosis, care and treatment of the patient that is ordinarily possessed and exercised by a Doctor or Nurse engaged in the same line of practice in the same or a similar locality. Negligence by a Doctor or a Nurse may consist of doing some act which such Doctor or Nurse should not have done under the circumstances or the failure to do something which such Doctor or Nurse should have done under the circumstances.

In deciding whether the Doctors or Nurses in this case possessed and used the degree of skill and learning required and whether or not their acts or failure to act was the proximate cause of the death of Jerry Breese, you may only consider the evidence presented by the Doctors and Nurses called as expert witnesses. However, expert evidence is not required where the treatment or the results thereof are of such character as to warrant an inference of want of care by persons of ordinary intelligence, sense and judgment." Record at 909; and

"(7) You are instructed that it is the duty of the psychiatric hospital in treating, caring for and maintaining a patient to possess and use that degree of skill and care which is ordinarily used by a psychiatric hospital in the same or similar locality at the time of the particular treatment or service. A failure to meet this standard of skill and care constitutes negligence.

In deciding whether the defendant hospital used the degree of skill and care required, and whether or not such act or failure to act was the proximate cause of the death of Jerry Breese, you may only consider the evidence presented by those individuals qualified as knowledgeable

about the practices and procedures of psychiatric hospitals who are called as expert witnesses. However, expert evidence is not required where the treatment or the result thereof are of such character as to warrant an inference of want of care by persons of ordinary intelligence, sense and judgment." Record at 981.

Breese's tendered instruction 18 stated:

"(18) You are instructed that the guarding and protection of patients suffering from mental disease is not a medical act and therefore the standard of care to be exhibited by LaRue Carter Hospital in the guarding and protection of patients is one of ordinary care. In determining ordinary care in such cases, it is proper to consider the physical and mental ailments of the patient which may affect his ability to look after his own safety." Record at 977.

Breese objected to instructions 6 and 7 on the ground that the standard of care for the protection of a mental patient is one of ordinary care whereas the instructions set out a medical standard, and because the instructions were confusing as to when expert testimony is required. LaRue Carter argues that Breese's tendered instruction 18 was covered by other instructions given and that final instructions 6 and 7 were correct statements of law. LaRue Carter notes that instructions with wording almost identical to the second paragraph of each of the given instructions, to which Breese's objections primarily are directed, have been approved in prior cases. See *Long v. Johnson* (1st Dist.1978) Ind.App., 177 Ind.App. 663, 381 N.E.2d 93; *Cochrane v. Lovett* (2d Dist. 1975) 166 Ind.App. 684, 337 N.E.2d 565; *Adkins v. Ropp* (1938) 105 Ind.App. 331, 14 N.E.2d 727.

Breese's complaint alleged that LaRue Carter "negligently caused the death of the decedent by its failure to guard and restrain said decedent in a manner to prevent him from injuring himself and that said defendant knew or should have known of the decedent's suicidal tendencies, and that the defendant failed to exercise such reasonable care and attention as the decedent's known mental condition required...." (Record at 2); and that the hospital breached its contract to care for, treat and hospitalize Jerry by failing "to guard, care for or protect the decedent from committing self destruction." Record at 4–5.[2]

Breese argues that the guarding and protection of a mental patient with suicidal tendencies is not a medical act and therefore expert testimony was not required. His position is supported by Indiana case law as well as that of other jurisdictions.

In *Fowler v. Norways Sanitorium, supra,* 42 N.E.2d 415, the Court adopted the following definition of the practice of medicine:

"The practice of medicine may be said to consist in three things: First, in judging the nature, character, and symptoms of the disease; second, in determining the proper remedy for the disease; third, in giving or prescribing the application of the remedy to the disease." 112 Ind.App. at 357–58; 42 N.E.2d at 420 (citation omitted).

The Court concluded that the guarding and protection of mental patients is not a medical act.

*Fowler* was recently cited in *Emig v. Physicians' Physical Therapy Service, Inc.* (3d Dist.1982) Ind.App., 432 N.E.2d 52, an action for injuries sustained when a wheelchair patient stood up and attempted to walk. The jury had been instructed that it could only consider expert testimony in determining the exercise of reasonable care. The Court stated the dispositive issue to be whether the decision not to restrain the patient was a ministerial rather than a medical decision. The Court concluded that it was a ministerial decision and that therefore, the case was not premised upon a medical malpractice theory, but rather upon a "common negligence theory to which the

---

**2.** In the context of this issue we need not consider the breach of contract allegations of Count III of the complaint. That count alleged a contractual duty to "care for" Breese. That is not germane to the negligence count which is restricted to the duty to "guard and restrain."

reasonable man standard must be applied." 432 N.E.2d at 53. Our Court held that the jury was improperly instructed with respect to reasonable care and reliance on expert testimony, and that expert testimony was improperly admitted regarding matters within the common knowledge and experience of the jury.

From the holding in *Fowler* that the guarding and protecting of mental patients with suicidal tendencies is a ministerial, rather than a medical, act, and from the Court's conclusion in *Emig* that expert testimony is improper with respect to observance of the standard of care applicable, we conclude that the jury was improperly instructed as to the necessity for and weight to be given expert testimony.

Even were we to hold that the "medical malpractice" standard embraced within Instructions 6 and 7 was appropriate to the jury's consideration of the alleged breach of LaRue Carter's contractual duty to "care for" Breese, the instructions were erroneously given. The instructions did not purport to limit the application of the standard to the availability or operability of the suction equipment. The overbreadth of the instructions would imply application of the malpractice standard to all aspects of the case. As such the instructions were misleading and confusing and should have been refused. *See Mullins v. Bunch* (1981) Ind., 425 N.E.2d 164; *Edwards v. Uland* (1923) 193 Ind. 376, 140 N.E. 546; *Inland Steel Co. v. Ilko* (1913) 181 Ind. 72, 103 N.E. 7; *Stewart v. Swartz* (1914) 57 Ind.App. 248, 106 N.E. 719. *See also Baldwin Piano Co. v. Allen* (1918) 187 Ind. 315, 118 N.E. 305.

We further conclude that Breese's tendered instruction 18 was a correct statement of the law, *see Emig, supra,* and *Fowler, supra,* and that it was applicable to the facts of this case and not covered by other instructions given. Breese was entitled to have the jury instructed that the guarding and protection of mental patients is not a medical act and that the applicable standard of care is one of ordinary care. *Dahlberg v. Ogle* (1978) 268 Ind. 30, 373 N.E.2d 159.

## III.

## FAILURE TO CALL AVAILABLE WITNESS

Breese next argues that the trial court erroneously refused to give his tendered instruction # 17, which stated:

"If it is peculiarly within the power of either the plaintiff or the defendant to produce a witness who could give material testimony on an issue in the case, failure to call that witness may give rise to an inference that his testimony would be unfavorable to that party. However, no such conclusion should be drawn by you with regard to a witness who is equally available to both parties. A witness who is an employee of a party is not equally available to both parties and is peculiarly available to his employer as a witness."

Breese argues that this instruction should have been given because the hospital did not call Dr. Miller, the psychiatric resident assigned to Jerry's case, or Dr. Smith, the psychiatric intern on call the night Jerry committed suicide. The only physicians employed by LaRue Carter at the time of Jerry's death who testified for the hospital were Dr. Moore, LaRue Carter's medical director, who had been out of the country at the time of Jerry's death, and Iver Small, M.D., who was acting medical director in Dr. Moore's absence.

Notwithstanding questionable precedent which as a general rule permits a negative implication from the failure to produce an available witness, it is proper to say that such implication is permissible against the party having an exclusive or pre-emptive access to the witness. *See Chrysler Corp. v. Alumbaugh* (3d Dist.1976) 168 Ind.App. 363, 342 N.E.2d 908, *modified on other grounds,* 168 Ind.App. 363, 348 N.E.2d 654.

The economic interests of an employee have been held to make him "peculiarly available" to his employer, 29 Am.Jur.2d *Evidence* § 181 (1967), and the failure of an employer to call as a witness an employee

who has knowledge of the facts in issue may justify an inference adverse to the employer. *Fairway Coffee Co. v. Selch* (1932) 98 Ind.App. 136, 183 N.E. 323; *Godwin v. DeMotte,* (1917) 64 Ind.App. 394, 116 N.E. 17; *Second National Bank v. Gibboney* (1909) 43 Ind.App. 492, 87 N.E. 1064.

LaRue Carter does not argue that the tendered instruction is an incorrect statement of law. Rather, it argues that the substance of the instruction is not supported by the record. *See Dahlberg v. Ogle, supra,* 373 N.E.2d 159. Specifically, it is contended that there is no evidence that Drs. Miller and Smith were not equally available to both parties because it is not shown that at the time of the trial Miller and Smith were employees of the defendant.

Breese concedes that the record is silent as to Drs. Miller and Smith's employment status at the time of trial, but argues that it may be presumed that they were still employees at that time, or that even as former employees, they were not equally available to the parties.

■ While under certain circumstances, a presumption of continued employment might be appropriate, *see, e.g., Kelso v. W.A. Ross Construction Co.* (1935) 337 Mo. 202, 85 S.W.2d 527, where, as here, the trial took place nearly six and a half years after the alleged negligence, such a presumption should not be applied.

Regarding the question whether an employee remains peculiarly "available" to his employer once the employment relationship is terminated, our Supreme Court in *Lamb v. State* (1976) 264 Ind. 563, 348 N.E.2d 1, held that no adverse inference could be drawn from the prosecutor's failure to call the investigating officer, who had left the employment of the state police prior to trial and could not be located. The Court stated that from evidence that the officer was no longer employed by the State Police, the trial court could reasonably have concluded that he was not within the State's control.

■ Most other jurisdictions which have considered the question have held that no adverse inference should arise from the failure to produce a former employee as a witness. *See Aguillard v. Home Insurance Co.* (1967) La.App., 203 So.2d 746; *Hahn v. Aetna Finance Co.* (1958) 251 Minn. 315, 87 N.W.2d 588; *Ellerman v. Skelly Oil Co.* (1948) 227 Minn. 65, 34 N.W.2d 251; *Valentino v. State* (1978) 62 A.D.2d 1086, 403 N.Y.S.2d 596; *Leear v. McGrath Corp.* (1976) 52 A.D.2d 804, 383 N.Y.S.2d 342; *Lopez v. William J. Burns International Detective Agency, Inc.* (1975) 48 A.D.2d 645, 368 N.Y.S.2d 221; and *Duckworth v. First National Bank* (1970) 254 S.C. 563, 176 S.E.2d 297. *But see White v. Metropolitan Life Insurance Co.* (1949) Mo.App., 218 S.W.2d 795 and *Schultz v. Hinz* (1952) 20 N.J.Super. 346, 90 A.2d 19. We agree with the majority view that where the employment relationship has terminated, generally the employer no longer exercises the requisite element of control necessary for an adverse inference to arise from the employee's absence from the trial.

Breese argues that even if no adverse inference arises from the doctors' status as present or former employees of the hospital, because Smith and Miller were originally named as co-defendants with LaRue Carter in Breese's wrongful death action, a "community of interest" developed between the doctors and the hospital. This interest, Breese contends, would have carried over even after the doctors ceased to be parties to the action because any negligence in Jerry's care and treatment could reflect adversely on their competence as doctors. Breese further asserts that Smith and Miller were not equally available as witnesses because of the reluctance of doctors to testify against other members of the medical profession.

■ While the likelihood of bias against or in favor of one party may render a potential witness more or less available to the other party, *see* 29 Am.Jur.2d *Evidence, supra,* § 180, we cannot find that, based upon Smith and Miller's status either as doctors or as former co-defendants with the hospital, the likelihood of bias was so great as to render them less available to Breese,

mandating a "missing witness" instruction. As the Third District of this Court cautioned in *Chrysler v. Alumbaugh, supra:*

"[W]hile such instructions may be appropriate when the facts in evidence uniquely require application of the principle involved, we do not approve their casual acceptance. In most cases, the record made will simply be silent as to why a particular witness was not called. There may be many legitimate reasons for the failure including the merely cumulative nature of the testimony to be secured, the failure of the witness to have perceived what he might have observed, or the existence of independent grounds for an opponent to question his general credibility. Under such circumstances, counsel may determine as a matter of trial strategy to bypass the witness, but not because he will testify adversely. Nor do we believe that the trial should be burdened with the production of all such witnesses simply to protect against an instruction or adverse inference." 168 Ind.App. at 376–77, 342 N.E.2d at 918.

In the present case, answers to certain interrogatories promulgated to both Drs. Miller and Smith were read into evidence and either party could have concluded that their testimony would be cumulative or unnecessary.

We conclude that the trial court did not err in refusing to read Breese's instruction # 17.

## IV.

### PROSPECTIVE INHERITANCE AND SUPPORT AS ELEMENTS OF DAMAGES

Breese argues that the trial court erred in failing to read his tendered instructions 11 and 13, which stated:

"(11) You are instructed that if you decide for the plaintiff on the question of liability you must then fix the amount of money which will reasonably and fairly compensate the son of the decedent for the pecuniary loss proved by the evidence to have resulted to him from the death of the decedent.

Where the decedent leaves a minor son the law recognizes a presumption that he has sustained some substantial pecuniary loss by reason of the death.

In determining pecuniary loss and the weight to be given to the presumption of pecuniary loss you may consider what benefits of pecuniary value, including money, goods, and services the decedent might reasonably have been expected to contribute to the son had the decedent lived, bearing in mind the following factors concerning the decedent:

1. What he earned prior to his death;

2. What he was likely to have earned in the future;

3. What he spent for customary personal expenses;

4. What instruction, moral training, and superintendence of education he might reasonably have been expected to give his child had he lived;

5. The reasonable value of his society, and companionship of which his son has been deprived;

6. His age;

7. His health;

8. His habits of industry, sobriety, and thrift;

9. His occupation;

10. The reasonable value of the loss of inheritance sustained by the decedent's son due to the premature death of his parent." Record at 970–71.

"(13) The pecuniary loss suffered by a child as a result of the death of a parent does not necessarily end with his arrival at the age of majority, but the jury may allow for the probable loss of any benefit of pecuniary value which a child would probably receive from his parent after arrival at majority. Such damages are not limited to the actual pecuniary damages sustained by the plaintiff by reason of loss of service of decedent, but must be confined to the pecuniary loss suffered, including the value in money of the comfort, society, support and protection of the decedent." Record at 973.

The trial court stated that both instructions were covered by other instructions and that damages for prospective inheritance were too speculative.

In support of his tendered instruction 11, Breese contends that the Court's instruction on the issues of damages, instruction 15, did not cover loss of prospective inheritance, and argues that while no recent Indiana cases have considered whether or not the loss of prospective inheritance is an element of damages in a wrongful death action, the majority of states with wrongful death statutes similar to Indiana's [3] have held it to be an element of damages. 91 ALR2d 477. Breese argues that the evidence shows "inherent probabilities" that Jerry Breese would have accumulated a fairly significant estate had he lived, and that it is reasonable to expect that his only child would have inherited a larger estate upon Jerry's death at a later date.

 A damage award must be determinable in some manner other than by mere conjecture or speculation. *Terrell v. Palomino Horse Breeders of America* (2d Dist.1980) Ind.App., 414 N.E.2d 332. While there was evidence that Jerry Breese was in good physical health at the time of his death, had a life expectancy of forty-five years, was earning around $5.50 per hour before he was hospitalized and had $900 in a savings account, there was also evidence that Jerry had exhausted his medical insurance and occasionally did not make $15 weekly payments for the support of his son, who was living with Jerry's former wife. *Cf. Solomon v. Warren* (5th Cir.1976) 540 F.2d 777 (loss of inheritance held to be recoverable where parents' estates valued at over $130,000 each, parents had substantial investment income and father had steadily rising salary.) Furthermore, there was a possibility that Jerry could have remarried and left other heirs to share in any accumulated property. Another factor which, despite expert testimony that de-

pression and suicidal desires tend to dissipate with time, would obscure any attempt to compute prospective accumulation of property is Jerry's mental illness, for which he was hospitalized on more than one occasion. *See Lange v. U.S.* (N.D.N.Y.1960) 179 F.Supp. 777, where the Court, while finding the defendant hospital liable for a mental patient's suicide, held that pecuniary loss would be held to a minimum if evidence was not convincing as to the decedent's cure and recovery to a point where he would have resumed his place in the world outside the institution and earned his livelihood. We conclude that the Court did not err in refusing to instruct the jury that it could consider loss of prospective inheritance in computing damages.

Regarding his tendered instruction 13, Breese contends that because of the close relationship between Jerry and his son, and Jerry's history of financial support for him, it is unreasonable to presume that this relationship would have ended when his son reached the age of majority and that he would thereafter suffer no further pecuniary loss from his father's death.

While damages for pecuniary loss were awarded to an adult child in *Duzan v. Myers* (1903) 30 Ind.App. 227, 65 N.E. 1046, that case is distinguishable on its facts. There the decedent's daughter, aged twenty-eight, had curvature of the spine and had occasionally received small amounts of money from the decedent. The Court held that the trial court might reasonably have concluded that "the misfortune of her physical infirmity would have insured for her the continuance of such aid as he could give." 30 Ind.App. at 236, 65 N.E. at 1050, and that she was therefore entitled to share in her father's estate.

 In *Solomon v. Warren, supra,* 540 F.2d 777, the Court held that while a definite age, applicable under all circumstances,

---

**3.** Indiana's wrongful death statute, I.C. 34–1–1–2 (Burns Code Ed.1973) provides that damages for wrongful death "shall be in such an amount as may be determined by the court or jury, *including, but not limited to,* reasonable

medical, hospital, funeral and burial expenses, and lost earnings ... resulting from said wrongful act or omission...." (emphasis supplied).

when a parent's nurture, instruction and training diminishes to the extent that it ceases to have a definite practical and financial value to the child, cannot be ascertained, in order for the children to recover for such losses after majority there must be a very specific showing that they "have or will suffer during their majority from the loss of their parents' nurture beyond the irreplaceable values of companionship and affection." (citation omitted) 540 F.2d at 790. The Court concluded that there was no specific showing to support such an award to the children. We conclude that the record here likewise does not support an award for pecuniary loss to Jerry's son after he reaches the age of majority, and affirm the trial court's refusal to instruct the jury that such damages were allowable.

## V.

### DEPOSITION ANSWERS OF MEDICAL WITNESS CONCERNING DUTY TO GUARD AND RESTRAIN AGAINST SUICIDE

 Breese argues that the trial court erroneously sustained LaRue Carter's objections to the admission of certain questions, and the answers thereto, from the deposition of Joseph Lloyd, M.D., Breese's expert witness, on May 12, 1978. In this connection, it is to be noted that reversal does not lie in the exclusion of inadmissible evidence even though the reason assigned by the objector or by the trial court may be in error. *Vandalia Ryco v. Keys* (1910) 46 Ind.App. 353, 91 N.E. 173.

LaRue Carter first objected to Question 44 of the deposition. Beginning with Question 43, Breese's attorney had questioned Dr. Lloyd as follows:

"43. Q. ... If a mental institution is on notice that a patient has suicidal tendencies, what measures can that institution take by way of precautions to see that the patient doesn't commit suicide?

A. Well, the standards for accreditation for psychiatric facilities that are promulgated by the Joint Commission lay down guidelines. There must be written guidelines in the hospital protocol.

MR. DEMPSEY: Excuse me. Can I ask a preliminary question here? On what dates were these guidelines written?

A. Circa 1972. They were preceded by the American Psychiatric Association Guidelines. These standards require written protocol to deal with many situations that take place in the wards. Certainly, the Joint Commission would find it unusual for a hospital not to have a written set of guidelines regarding suicide precautions. The implementation of these guidelines varies from institution to institution. It depends on their staffing ratios.

I have one way of doing it in my facility. I am sure that Indiana Central has a different way of doing it.

44. Q. Doctor, would you say that a mental hospital is under a duty to protect a patient from known or foreseeable danger of committing suicide?

MR. WAMPLER: We would object.

MR. DEMPSEY: I would object. Calls for a legal conclusion.

A. The guidelines indicate that they are.

\*　　\*　　\*　　\*　　\*　　\*

A. The guidelines for Nursing Standards in the Joint Commission Standards for Accreditation require that the nursing service promulgate written standards for the protection of all patients." Record at 95–96.

LaRue Carter objected to Question 44 as calling for a legal conclusion by the witness, and because there had been no showing of Dr. Lloyd's background and ability to make the determination called for. The trial court sustained the objection on the ground that the question "purport[ed] to ask him something that's probably a question on a matter of law." Record at 147–48.

Breese argues that the question did not require, nor did the answer state, a legal conclusion; rather the answer merely set out the duty assumed under the guidelines

referred to. He also contends that Dr. Lloyd's ability to make the determination called for was shown by the witness's prior testimony concerning his educational and work experience, and that by his response to the question itself and his testimony on cross-examination he showed his familiarity with the standards.

We agree with the trial court's ruling that the question called for a legal conclusion by the witness as to whether a mental hospital has a duty to protect a potentially suicidal patient from committing suicide. While it is possible, in light of the previous reference to the Guidelines in Question 43, to interpret the question as asking whether such a duty exists according to the Guidelines, Question 44 is not worded as such, and was therefore properly excluded. If Breese's counsel intended the question to refer to a duty under the Guidelines rather than a legal duty, he should have made such intention clear by specific reference to the Guidelines. We affirm the trial court's exclusion of Question 44 and the answer thereto on the ground that it called for a legal conclusion by the witness.

Secondly, the Court sustained LaRue Carter's objections to Question 47 and 48 and the answers given thereto:

"47. Q. Doctor, assume that a patient who has previously attempted to harm himself is transferred from one mental hospital to another mental hospital and assume during that transfer, let's say it took a half hour, that that patient seemed all right, and further assume that that information that he seemed all right was transmitted to the admitting hospital. Would that admitting hospital be entitled to rely upon that kind of information?

The answer of Dr. Lloyd was:

A. For a half hour's behavior?

48. Q. Yes.

. . . . . .

A. A half hour's behavior by any patient is probably not relevant." Record at 99.

LaRue Carter objected that Question 47 called for a legal conclusion by the witness, and was incomplete and factually incorrect regarding the length of the period of apparently normal behavior. The trial court sustained the objection on the ground that the question called for "an opinion-type response."

We agree with Breese that these questions were not properly excluded as calling for an opinion or conclusion. While expert opinion evidence is inappropriate on matters within the common knowledge and experience of ordinary persons, *Rosenbalm v. Winski* (3d Dist.1975) 165 Ind. App. 378, 332 N.E.2d 249, it is admissible where proper for the decision of a question relating to the issues in a case, *New York, C. & S.L. R. Co. v. Grand Rapids & I. R. Co.* (1888) 116 Ind. 60, 18 N.E. 182, and where a subject does not come within the range of common knowledge and experience. *Rosenbalm, supra; Johnson v. Bender* (3d Dist.1977) 174 Ind.App. 638, 369 N.E.2d 936. Furthermore, opinion testimony by an expert witness even as to an ultimate fact in issue is not objectionable for the reason that it invades the province of the trier of fact. *DeVaney v. State* (1972) 259 Ind. 483, 288 N.E.2d 732; *Matter of Adoption of Lockmondy* (3d Dist.1976) 168 Ind.App. 563; 343 N.E.2d 793.

The theory of liability in this regard does not involve medical acts. It is not therefore dependent upon expert testimony. *Emig v. Physicians' Physical Therapy Service, Inc.* (3d Dist.1982) 432 N.E.2d 52. Nevertheless, the subject of inquiry in the excluded questions was sufficiently beyond common experience so that expert opinion would tend to assist the trier of fact. *Underhill v. Deen* (4th Dist.1982) Ind.App., 442 N.E.2d 1136; *Fowler v. Norways Sanatorium* (1942) 112 Ind.App. 347 at 354, 42 N.E.2d 415, *supra.* Furthermore, Dr. Lloyd's nearly twenty years of experience in psychiatry, upon which he had expanded prior to answering Questions 47 and 48, was a sufficient basis for his opinion.

We also find that the questions did not call for a "legal conclusion" on Dr. Lloyd's

part; rather he was asked to comment upon the indicative medical significance, if any, of a period of apparently normal behavior by a mental patient with suicidal tendencies. Such opinion is admissible. *See Underhill v. Deen, supra.*

LaRue Carter argues that the exclusion of Questions 47 and 48, and the answers thereto, was proper because they were based on facts not in evidence and tended to mislead the jury; specifically that there was no evidence at trial regarding the duration of the transfer or that the thirty-minute period was the extent of Breese's normal behavior.[4] LaRue Carter further argues that even if the exclusion was erroneous, Breese has not shown prejudice thereby.

LaRue Carter's assertion that there was no evidence at trial regarding the duration of the transfer is in error. Reverend Moore, who visited Jerry at LaRue Carter, testified that it took him about twenty minutes to drive there from Methodist Hospital. In addition, Methodist Hospital records state the time of Jerry's discharge as 9:00 A.M. and LaRue Carter records show that he was admitted to his ward at 9:50 A.M. From the evidence it could be inferred that the time required to transfer Jerry from Methodist to LaRue Carter was between twenty and fifty minutes.

In *Walters v. Kellam & Foley* (2d Dist. 1977) 172 Ind.App. 207, 360 N.E.2d 199, we stated:

"A hypothetical question need not contain all the facts in evidence. It must, however, contain sufficient facts and inferences to present a true and fair relationship to the whole evidence in the case. It must not be so worded or exaggerated as to mislead or confuse the jury; and it must not be so lacking in essential facts as to be without value to the decision." 360 N.E.2d at 219 (citations omitted).

(In *Walters,* the hypothetical question stated that the Plaintiff's feet were spread fifteen inches whereas earlier testimony

was only that he spread his feet.) *Accord: Town of Newburgh v. Jones* (1945) 115 Ind. App. 320, 58 N.E.2d 938. We find that the thirty-minute period assumed in the hypothetical was not so inaccurate as to require exclusion of the question.

As to LaRue Carter's objection that there was no evidence that the thirty-minute period was the extent of Breese's normal behavior, Breese correctly maintains that LaRue Carter could have questioned Dr. Lloyd on cross-examination regarding the significance of normal behavior for a greater period of time. *Northern Indiana Public Service Co. v. Otis* (1969) 145 Ind.App. 159, 250 N.E.2d 378.

We conclude that the trial court erred in excluding Questions 47 and 48 and the answers thereto.

Breese next contends that Question 51 and the answer thereto were erroneously excluded from evidence. Question 51 was in the form of a lengthy hypothetical dealing solely with facts prior to the suicidal act of Breese and concluded as follows:

"Assuming that, Doctor, would you have an opinion as to the standard of care required by LaRue D. Carter as a mental hospital in the handling and treatment of this patient in an area such as Indianapolis or in an area similar to Indianapolis, Indiana? Do you have such an opinion?" Record at 102.

After objection by LaRue Carter, Dr. Lloyd stated his opinion:

"A. My opinion is that the defendant hospital was negligent." Record at 103–104.

At trial the defendant objected to Question 51 for a number of reasons, including:

"... the facts in the hypothetical include: .... Further assume than on November 26, 1973, the treating physician dictated a discharge summary wherein he noted the following: ... This has not been testified in Court ... if the discharge summary is testified to and/or

---

4. LaRue Carter does not contend that it did not have knowledge of that period of normal behavior.

read in this Court, the Court will find that that discharge summary was dictated on the date of the decedent's death but was not transcribed until after the decedent's death and was never, in fact, given to LaRue Carter so that certainly is an objectionable statement for a hypothetical as to the standard of care of LaRue Carter." Record at 361–63.

In sustaining the objection of the defendant, the trial judge remarked:

"Well still with regard to this discharge summary, isn't it still a fact though, that though the discharge summary may have been dictated on the 26th of November and it wasn't transcribed until several days later, and, therefore, was not a bit of information which LaRue Carter had access to on the day in question." Record at 367.

At this point one of Breese's attorneys pointed out that whether or not the discharge summary went to LaRue Carter, there was testimony from Breese that he told LaRue Carter employees about Jerry's suicide attempt at Methodist with his belt, and in admissions by hospital personnel, they admitted that they knew of his attempts to hang himself. The trial court excluded the hypothetical as requiring the witness to state a legal standard and as incomplete, because it included information not in the record. The court also sustained objections to Questions 53 and 54, apparently on the same grounds it cited for the exclusion of Questions 51 and 52.

■ We uphold the exclusion of this lengthy hypothetical and the related questions and answers thereto on the ground that it failed to present a "true and fair relationship to the whole evidence in the case." *Walters, supra* 172 Ind.App. at 219, 360 N.E.2d 199. While the discharge summary from Methodist did contain information concerning Jerry's previous suicidal actions, the hypothetical carries the inference that LaRue Carter personnel would have had access to the information upon Jerry's admission and arguably Dr. Lloyd's answer assumes that fact. In fact LaRue Carter did not receive the discharge summary until several days later.

Perhaps more important, it calls for an opinion as to the required standard of care in the "handling and treatment in an area such as Indianapolis ...." As heretofore noted, the liability alleged does not involve medical malpractice. Therefore the standard assumed in the hypothetical question is inapplicable to the facts included in that question. Exclusion of the evidence was proper. *Emig v. Physical Therapy Service, Inc., supra.* We therefore affirm the exclusion of Questions 51 through 54 and their answers.

LaRue Carter next objected to Questions 59 through 61 which read as follows:

"59. Q. Now, Doctor, based upon your study of those records, do you have an opinion as to whether or not LaRue D. Carter Memorial Hospital met the required standard of care for handling of that particular patient in the area of Indianapolis or an area similar to Indianapolis, Indiana?

A. I do.

. . . .

60. Q. All right, Doctor. Would you state, then, the basis for your opinion.

61. Q. Would you state your opinion now, Doctor, and later on I will ask you for the basis of it.

. . . .

A. My opinion is that LaRue Carter Hospital did not even follow their own physician's orders in caring for this patient." Record at 106–07.

■ This proffered evidence bears the same infirmity as evidence previously discussed. The opinion solicited is restricted to a particular geographical area and erroneously presupposes a medical malpractice standard. It was properly rejected.

## VI.

INTERROGATORY ANSWERS OF MEDICAL WITNESS CONCERNING FACTS UNRELATED TO SUICIDAL ACT OF PATIENT

Breese next argues that the court erred in sustaining LaRue Carter's objection to

the introduction of answers given by E. Smith, M.D., to Appellant's Interrogatories 46 and 47.

Dr. Smith was the psychiatric intern on call the evening that Jerry committed suicide. He was summoned to and arrived at Jerry's room at 6:05 P.M., approximately 5 to 10 minutes after Jerry had been found hanging by a belt. Dr. Smith directed that an ambulance from Marion County General Hospital be summoned. An external defibrillator and various drugs were employed in an unsuccessful attempt to revive Jerry.

In his clinical report, which was admitted without objection as part of Plaintiff's Exhibit 2, Dr. Smith stated that in his efforts to revive the decedent, he "was unable to adequately ventilate due to copious amounts of vomitus and lack of suction equipment." Record at 223. Dr. Smith was asked in Question 42 whether "[p]rior to the time you were called to Jerry Breese's room, did you know how many sets or the approximate number of sets of suction equipment of the type it subsequently developed was required for the adequate treatment for Jerry Breese's condition were available at LaRue D. Carter Memorial Hospital?", and he answered that he did not. Record at 643.

LaRue Carter objected to the question as characterizing the answer required because there had been no previous testimony as to whether or not suction equipment was required for Jerry's "adequate treatment." LaRue Carter further objected that any reference to suction equipment was irrelevant because outside the scope of the pleadings, and that the question invaded the province of the jury. The objection was overruled.

LaRue Carter then objected to Interrogatories 46 and 47 and the answers thereto:

"INTERROGATORY NO. 46

After the death of Jerry Breese did you make any recommendation or suggestion to anyone connected with LaRue D. Carter Memorial Hospital that the suction equipment available at that institution was inadequate?

ANSWER TO INTERROGATORY NO. 46

After the incident a suggestion was made to make such equipment available.

INTERROGATORY NO. 47

If the answer to the preceding interrogatory is affirmative, then state the following:

(a) The date each such recommendation or suggestion was made,

(b) The name and job title of each person to whom such recommendation or suggestion was made,

(c) The reasons that prompted you to make each such recommendation or suggestion,

(d) The action, if any, that was taken as a result of each such recommendation or suggestion.

ANSWER TO INTERROGATORY 47

(a) The morning of November 27, 1973

(b) Donald Moore, M.D., Administrator of LaRue D. Carter Memorial Hospital

(c) I was concerned that the equipment was not available the prior evening

(d) I do not know." Record at 69–70.

The objections were based on the grounds previously raised in opposition to Interrogatory 42, and additionally, because the questions and answers thereto involved a "subsequent change type situation." Record at 632. The court sustained the objection, stating that an employee cannot bind his employer to the recognition of a failure to adequately take precautions.

Breese argues that the exclusion of Interrogatories 46 and 47, and Dr. Smith's answers thereto, was prejudicial error because Dr. Smith's statements recognizing that suction equipment should have been available, contradicted testimony by Dr. Moore that the availability of suction equipment would have made no difference in the attempts to revive Jerry, and testimony by Iver Small, M.D., as Assistant Superintendent at LaRue Carter, that the only comment made by Dr. Smith regarding suction equipment on the day following the incident was that it "didn't work."

LaRue Carter responds that exclusion was not erroneous because the substance of

the statements was presented to the jury through other evidence and that Breese's "tenuous argument" is based upon "*his* interpretation of a technical and trivial ambiguity" (Appellee's Brief at 19)—whether "not available" means "inoperative" or "non-existent." We note here that even if Dr. Smith meant or said that the suction equipment "didn't work" or was "inoperative" such could be interpreted either as malfunctioning (from which the jury could infer negligence on the hospital's part) or merely that it was not effective in reviving Jerry. We do not find this distinction nor the distinction between "inoperative" and "non-existent" to be "technical" or "trivial." Nor do we agree that the substance of Dr. Smith's responses to Interrogatories 46 and 47 was cumulative of other evidence. This testimony could be considered as clarification of what Dr. Smith meant in his clinical report by "lack of suction equipment," and was particularly relevant in light of the testimony of Drs. Moore and Small to the effect that such equipment was available or would not have affected the resuscitation attempts.

In considering the objections made by LaRue Carter at trial, we first consider those it had previously raised with regard to Interrogatory 42: that the question characterized the answer required because there was no previous testimony regarding the necessity of suction equipment for Jerry's "adequate treatment," that the issue was outside the scope of the pleadings, and that the doctor's response invaded the province of the jury.

Prior to the point at trial when the interrogatories were offered, Larry Davis, M.D., an expert witness for LaRue Carter, testified that he agreed with recommendations by the Joint Commission that suction and oxygen equipment should be available for emergency treatment at psychiatric facilities. Therefore, testimony regarding the necessity of suction equipment was in evidence prior to the time when the interrogatories were offered.

LaRue Carter's argument that the subject was outside the scope of the pleadings

must also fail because upon Breese's oral motion pursuant to T.R. 15(B), the pleadings were amended to conform with the evidence. A caveat must be added, however. The plaintiff's oral motion for amendment of the pleadings as to inadequacy or lack of suction and oxygen equipment could be held to relate only to the "general allegations of lack of care and protection," for this was the precise and limited request made by plaintiff. The general allegation was, as earlier noted, contained solely in the breach of contract count of the complaint. We therefore hold that only that count of the complaint may be deemed amended to conform to the evidence concerning such equipment. *See Svetich v. Svetich* (3d Dist. 1981) Ind.App., 425 N.E.2d 191; *Elkhart County Farm Bureau Cooperative Assn., Inc. v. Hochstetler* (3d Dist.1981) Ind.App., 418 N.E.2d 280; *Lewis v. Davis* (3d Dist. 1980) Ind.App., 410 N.E.2d 1363.

LaRue Carter objected at trial that Interrogatories 46 and 47 should be excluded because they involved a "subsequent change type situation." It is generally held that evidence of remedial conduct subsequent to the happening of an accident is inadmissible to show negligence. *Dudley Sports Co. v. Schmitt* (2d Dist.1972) 151 Ind.App. 217, 279 N.E.2d 266. However, as *Schmitt* holds, evidence which might constitute subsequent remedial conduct is nevertheless admissible if, as here, it is relevant to prove facts other than negligence. Furthermore, Dr. Smith's statements are not evidence of subsequent *remedial conduct,* as he did not indicate, nor was he aware, whether any action had been taken pursuant to his recommendation that suction equipment should be available. We therefore find that the "subsequent change" doctrine afforded no ground for the exclusion of Interrogatories 46 and 47 and their answers.

Next we consider the reason given for the trial court's exclusion of the interrogatories: that an employee cannot bind his employer to the recognition of a failure to take adequate precautions.

Breese argues that Dr. Smith's responses were admissions. An admission is a state-

ment against the interests of a party which is inconsistent with a defense or tends to establish or disprove a material fact. *Uebelhack Equipment, Inc. v. Garrett Brothers* (1st Dist.1980) Ind.App., 408 N.E.2d 136; *Smith v. City of South Bend* (3d Dist.1980) Ind.App., 399 N.E.2d 846. Declarations, admissions, or acts of an agent are evidence against his principal when made as to a matter which is being transacted at the time within the scope of his agency, *Indiana Union Traction Co. v. Scribner* (1911) 47 Ind.App. 621, 93 N.E. 1014. *See Uebelhack, supra.*

Dr. Smith was employed by LaRue Carter as a psychiatric intern on the night of Jerry Breese's death. Dr. Moore testified that Dr. Smith was the emergency physician for the psychiatric facilities for the whole medical center complex. Dr. Moore also testified that the statement regarding the recommendation as to suction equipment would have been made at a morning staff meeting which was routinely held in Dr. Moore's office. By virtue of his position, Dr. Smith had the implied authority to make recommendations regarding the necessity that suction equipment be made available.

Other jurisdictions have held similar admissions by agents admissible. In *Berkebile v. Brantly Helicopter Corp.* (1975) 462 Pa. 83, 337 A.2d 893, a memorandum written by the defendant helicopter manufacturer's chief test pilot, who was concerned about rapid rotor decay in climbing flight, to the defendant's president, while the pilot was acting as an agent of defendant in the course of his duties and within the scope of his authority, was admissible in a suit against the manufacturer for death of a pilot as substantive evidence against the manufacturer.

In *Pietrucha v. Grant Hospital* (7th Cir. 1971) 447 F.2d 1029, reversible error was found in the trial court's denial of the plaintiff's motion to call as an adverse witness a hospital supervisor who had allegedly made a statement to the police, upon taking a belt from the decedent's neck after he hanged himself in a psychiatric ward, that

"This is the man's belt. He should not have had it."

In *Mercurdo v. County of Milwaukee* (1978) 82 Wis.2d 781, 264 N.W.2d 258, a medical malpractice action, the trial court's exclusion of a portion of the hospital's accident record stating that the accident which gave rise to the action could have been prevented if the plaintiff's arm had been restrained so that she could not thrash around while in pain was held to be prejudicial error. The defendant had objected to this portion of the accident record as hearsay, and the plaintiff contended that the statement was not barred as hearsay because it was an admission. The court cited a Wisconsin law, Sec. 908.01(4), Stats., (1975) which provided that a statement offered against a party by a person authorized by him to make a statement concerning the subject, or by his agent or servant concerning a matter within the scope of his agency or employment, made during the existence of the relationship, is not hearsay. The statement at issue there was made by a senior medical student, who completed the accident record in accordance with the usual hospital practice that the physician present at the time fill out the accident report as soon as possible. The Court held that the report should have been admitted because the medical student was an agent or employee of the hospital and the report was made within and during the existence of the relationship. The Court found its exclusion to be prejudicial error because the statement was directly contrary to testimony by one of the hospital's medical witnesses that restraints were not needed.

Dr. Smith's responses to the interrogatories clarified remarks made in his clinical report and contradicted other witnesses' explanations of those comments. We conclude that Dr. Smith's responses to the interrogatories were admissible as admissions.

LaRue Carter contends that even if the exclusion of Dr. Smith's answers were error, under the holding of *Wm. J. and M.S. Vesey, Inc. v. Hillman* (1972) 151 Ind.App. 388, 280 N.E.2d 88, such error was harmless because Breese had other means available

for obtaining the same information, i.e., he could have taken Dr. Smith's deposition or arranged for his presence at trial. We do not find *Vesey* controlling. In *Vesey,* the appellant claimed surprise at trial because he had not received answers to his interrogatories. The court held that error, if any, was harmless in light of the other procedures available for obtaining the same information. Here, the interrogatories had been answered and the information was obtained by Breese, but ruled inadmissible.

The trial court's ruling as to the exclusion of answers to Interrogatories 46 and 47 was reversible error.

## VII.

## TESTIMONY IS NOT IMPEACHED BY CONTRARY STATEMENT OF THIRD PARTY

█ Breese next argues that the trial court erred in sustaining LaRue Carter's objection to the use of the same answers given by Dr. Smith to Interrogatories 46 and 47 during Breese's cross-examination of Dr. Moore, and that Breese was deprived of a fair trial by incorrect testimony given regarding Dr. Smith's statements as to the availability of suction equipment. The grounds for objection were that the interrogatories invaded the province of the jury, dealt with matters outside the pleadings and involved a "subsequent change type situation," and because an objection to reading the interrogatories had already been sustained. The court sustained the objection, stating that because there was apparently no "factual dispute between the parties as to whether or not there was a duty to have [the] equipment [available]," (Record at 833–35) the evidence should not be allowed as a recognition on Dr. Smith's part of the necessity of it being there, and that the statement could not be used to contradict, rather than impeach, the witness.

Breese contends that the use of the interrogatory answers was proper cross-examination because LaRue Carter injected the topic of suction equipment on direct examination when Dr. Moore testified that such equipment was available at the hospital on the day of Jerry's death.

We uphold the trial court's exclusion of Dr. Smith's answers upon cross-examination of Dr. Moore. It is incorrect to say that a witness's testimony is "impeached" by a statement of a third party which merely disputes or is contrary to the facts stated by the first witness. Such statement if otherwise admissible is merely evidence placing the matter in dispute for resolution by the trier of fact. *See People v. McKee* (1968) 39 Ill.2d 265, 235 N.E.2d 625. Breese cites *Fahler v. Freeman* (1968) 143 Ind.App. 493, 241 N.E.2d 394, as support for his argument that he should have been permitted to present contradictory evidence to "counteract the false impression created by Dr. Moore." Reply Brief for Appellant at 27. However, *Fahler* did not involve attempted "impeachment" by a *third person's* statement but rather the statement of the witness, and is thus distinguishable. Breese's contention that he was deprived of a fair trial by incorrect testimony is merely an attempt to have us reweigh the evidence and pass upon the witnesses' credibility, not a function of this Court. *Wash v. State* (3d Dist.1980) Ind.App., 408 N.E.2d 634. This argument is also without force in light of our reversal of the trial court's exclusion of the answers to interrogatories in part VI, *supra.* We therefore hold that the trial court did not err in denying Breese's attempt to use the interrogatory answers on cross-examination.

## VIII.

## RES IPSA LOQUITUR

At the close of Breese's case, LaRue Carter moved for a judgment on the evidence as to Count II of Breese's amended complaint, which was based upon the doctrine of res ipsa loquitur. LaRue Carter argued that the element of exclusive control was not established, and that the death of a patient by suicide does not raise an inference of negligence since suicide often occurs in the absence of negligence. LaRue Carter also argued that res ipsa does not apply

where the plaintiff is aware of what took place. The trial court granted the motion at the close of all the evidence, stating that res ipsa is not applicable where the evidence is precise regarding what instrumentality produced the death, and that LaRue Carter did not have exclusive control of such instrumentality.

The conditions usually stated as necessary for the application of the doctrine of res ipsa loquitur are: (1) the event must be of a kind that ordinarily does not occur in the absence of negligence; (2) it must be caused by an agency or instrumentality within the defendant's exclusive control, and (3) it must not have been due to any voluntary action or contribution on the plaintiff's part. W. Prosser, *Law of Torts* § 39 (4th ed. 1971), *citing* 4 Wigmore, *Evidence* § 2509 (1st ed. 1905). *See: New York, Chicago & St. Louis R.R. Co. v. Henderson* (1957) 237 Ind. 456, 146 N.E.2d 531. Prosser states that a fourth condition, at least suggested by some courts, is that evidence as to the true explanation of the occurrence must be more readily accessible to the defendant than to the plaintiff. Prosser, *supra; see: Henderson, supra.*

As noted, in order to apply the doctrine of res ipsa loquitur, the injury must be of a character which would ordinarily not occur but for an act of negligence. *Carpenter v. Campbell* (1971) 149 Ind.App. 189, 271 N.E.2d 163. *See also Stanley v. Fisher* (1st Dist.1981) Ind.App., 417 N.E.2d 932. LaRue Carter argues that death by suicide of a mental patient with a history of suicidal action is not so unusual as to have been an unlikely occurrence in the absence of negligence.

In *Hartman v. Memorial Hospital of South Bend* (3d Dist.1978) Ind.App., 177 Ind.App. 530, 380 N.E.2d 583, the patient/decedent was admitted to the hospital's psychiatric ward for acute depression and committed suicide the next day. In his wife's action against the hospital, her principal allegation was that the hospital should have maintained continuous one-to-one observation because it should have realized that he was suicidal. The Court found that there was testimony supporting the instruction given to the effect that suicides may occur no matter what hospital care is provided.

Here, Dr. Moore testified that in November of 1973, approximately half of the patients at LaRue Carter either exhibited or had a history of suicidal behavior, and that, in his opinion, it was not absolutely possible to prevent a person from committing suicide. Dr. Davis testified that the only way to absolutely prevent suicide is to use four-way restraints on the patient "with half a dozen people watching every move" (Record at 568) but that such excessive restraint is detrimental to an already disturbed patient. Thus, there is testimony in the record indicating that the suicide of a patient with a history of suicidal tendencies is not an event which would be unlikely to occur in the absence of negligence.

Application of res ipsa loquitur to the facts before us would constitute a holding that suicide by any person with a prior history of suicidal tendencies who is in the physical custody of another—for example, in penal institutions or hospitals—establishes liability on the part of the custodian. Adoption of such a doctrine would make the custodian an insurer of the safety of the suicidal individual. The concept of res ipsa loquitur is not so sweeping.

We affirm the judgment as to Count II of the complaint. We reverse the judgment as to Counts I and III. The cause is remanded for a new trial as to those Counts.

BUCHANAN, C.J., and SHIELDS, J., concur.