Ava McSWANE, as Personal Representative of the Estate of Malia Vandeneede, and Danielle Hays by Ava McSwane, Appellants–Plaintiffs,

v.

BLOOMINGTON HOSPITAL AND HEALTHCARE SYSTEM, Appellee–Defendant,

Jean M. Eelma, M.D., Appellee–Defendant.

No. 53A04–0705–CV–243.

Court of Appeals of Indiana.

March 12, 2008.

David W. Stone IV, Stone Law Office & Legal Research, Anderson, IN, Stephen A. Oliver, Boren, Oliver & Coffey, Martinsville, IN, Attorneys for Appellants.

James L. Whitlatch, Holly M. Harvey, Bunger & Robertson, Bloomington, IN, Attorneys for Bloomington Hospital.

Edward J. Liptak, Jeremy M. Dilts, Carson Boxberger LLP, Bloomington, IN, Attorneys for Jean Eelma, M.D.

## OPINION

MAY, Judge.

Bloomington Hospital treated Malia Vandeneede for injuries she said she sustained when she fell off a horse onto some debris. After treatment, she was discharged into her former husband's custody. He killed her on their way home, then killed himself. Ava McSwane, Malia's mother and personal representative, sued the Hospital and Dr. Jean Eelma, who treated Malia, asserting they had a duty to protect her from the domestic violence. The trial court granted summary judgment for the Hospital and Doctor on the grounds they had no duty toward Malia and Malia was contributorily negligent. We affirm the summary judgment for the Doctor but reverse the summary judgment for the Hospital.

### FACTS AND PROCEDURAL HISTORY [1]

Malia and Monty Vandeneede were married for about a year. They divorced, but continued to live together for another two years. Monty took Malia to Bloomington Hospital for treatment of lacerations on November 25, 2002. Malia told the triage nurse she had fallen off a horse and landed on debris. She had a deep laceration to her palm that "went well into the muscle," (App. at 252), and a deep laceration and puncture to her thigh. She reported arm and wrist pain.

The nurse noted Monty would not let her get close to Malia and he was answering questions for Malia. The nurse noted other "things that started tipping me off maybe that she … wasn't wearing any underwear, riding a horse, and then the clothing that she was wearing wasn't dirty[.]" (*Id.* at 220) (ellipses in original). This suggested to the nurse "[j]ust that something was wrong. She probably didn't fall off a horse." (*Id.* at 221.) At one point when Monty was looking away, the nurse pointed to a "domestic violence piece of paper," (*id.* at 222), in the triage room so Malia could "see that it was there, and she shook her head violently." (*Id.* at 223.)

According to McSwane, a Hospital policy "required that suspicions of spousal abuse, after screening, be conveyed to the attending physician." [2] (Br. of Appellants at 5.)

---

1. We heard oral argument October 19, 2007 at Franklin College during the Indiana High School Press Association's annual meeting. We thank the Association and the College for their hospitality and commend counsel for the quality of their advocacy.

2. To support this statement, McSwane directs us only to testimony by one of the nurses, and not to the policy itself. The Hospital policy appears to require such reporting only for patients within its "endangered adult" guidelines. (App. at 938.) "Report of abuse of independent adults is voluntary." (*Id.*) The

The triage nurse testified that after Malia was taken to see the doctor, the nurse called to "try to alert somebody that I thought something was happening here. And maybe we should get security back there." (App. at 223.) She did not recall to whom she spoke and the Hospital could not identify anyone who received such a call. McSwane directs us to no evidence the triage nurse conveyed any such suspicion to the emergency room physician who next saw Malia.

Malia was in the triage and emergency rooms for about five hours before she was transferred to Dr. Eelma, a surgeon. The emergency room doctor had called Dr. Eelma and told her his patient had some puncture wounds that would need to be sutured in surgery. A surgical nurse felt uncomfortable in the same room with Malia and Monty, because Monty "had a defensive stance, and . . . like he was looking right through you." (*Id.* at 846) (ellipses in original). Malia "seemed to be somewhat guarded. Careful of what she would say . . . always aware of exactly where he was . . . before she answered anything." (*Id.*) This caused the nurse to suspect Monty might have been involved in Malia's injury. After Monty went to the waiting room, Malia "stuck to her story" that she had been thrown from a horse, (*id.* at 847), and that allayed the nurse's concerns.

Dr. Eelma told the surgical nurse Malia's mother had said the injuries did not occur as Malia said they had. The nurse opined to the Doctor it was "not unreasonable to believe what [Malia] was telling

us." (*Id.* at 854.)[3] The nurse testified Malia was asleep at the time of that conversation but other hospital employees in the room would have overheard it.

McSwane arrived at the hospital while Malia was being treated and told a nurse Monty had beaten Malia with a fireplace poker. Security was contacted, and McSwane called Monroe and Owen County police, who apparently did not respond. A nurse in the Post Anesthesia Care Unit who attended Malia after surgery was told domestic violence might be involved and security had been called. He found Malia calm and oriented, and Malia told the nurse she wanted to go home. Monty was cooperative and was not coaching Malia. However, that nurse told some co-workers Monty "is actually creeping the hell out of me," (*id.* at 122), and he suspected Monty might have inflicted the injuries. The nurse noted Monty was "really good at throwing off non-verbal intimidation." (*Id.* at 124.) Eventually Malia signed the instructions for discharge and said she understood them.

Security accompanied Malia out of the Hospital. The charge nurse told Malia she did not have to leave and could stay at the Hospital. Malia declined. Security officers described Monty as compliant and not threatening. Malia was described as having "her right mind." (*Id.* at 511.) McSwane pleaded with Malia not to leave with Monty but Malia told her to "stay out of their business." (*Id.* at 378.) Malia was asked if she wanted to press charges

---

Hospital's "endangered adult" guidelines do not appear to be included in the record before us. But as explained below, there is a genuine issue of material fact as to whether Malia might have been an "endangered adult" to which statutory reporting requirements would apply.

**3.** That nurse later in the same deposition testified she was not sure the conversation had happened the day Malia was treated: "It may have been the next day, or even the next day . . . it was a couple of days down the road before I was back at work, and . . . people were talking about it." (App. at 863.) She also testified she was not sure she had received that information from Dr. Eelma.

against Monty or leave with him, and she said she wanted to go home.

Soon after Malia was discharged Monty killed her, then committed suicide. McSwane brought a medical malpractice complaint, and McSwane, the Hospital, and Dr. Eelma all moved for a preliminary determination of law.[4] The Doctor and Hospital moved for and were granted summary judgment.

## DISCUSSION AND DECISION

Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Rhoades v. Heritage Invs., LLC,* 839 N.E.2d 788, 791 (Ind.Ct.App.2005), *trans. denied* 860 N.E.2d 584 (Ind.2006). When reviewing a decision on a summary judgment motion, we stand in the shoes of the trial court. *Id.* A grant of summary judgment is clothed with a presumption of validity. *Id.*

■ A medical malpractice case based on negligence is rarely appropriate for disposal by summary judgment, *Mills v. Berrios,* 851 N.E.2d 1066, 1070 (Ind.Ct. App.2006), but whether a duty exists on the part of a particular defendant to conform his conduct to a certain standard for the benefit of the plaintiff generally is a question of law. *Harris v. Raymond,* 715 N.E.2d 388, 393 (Ind.1999), *reh'g denied.*

### 1. *Dr. Eelma's Duty*

■ McSwane asserts Dr. Eelma had a statutory duty to Malia to report her abuse based on Ind.Code § 35–47–7–1, which provides in pertinent part "every case of a wound *which is likely to or may*

*result in death* and is actually or apparently inflicted by a knife, ice pick, or other sharp or pointed instrument, shall be reported at once to the law enforcement authorities ... [by] the physician attending or treating the case." (Emphasis supplied.) She quotes James T.R. Jones, *Battered Spouses' Damage Actions Against Non-reporting Physicians,* 45 DePaul L.R. 191, 247 (1996), for the premise the "statutory negligence doctrine ... generates a special relationship, and hence a duty, where there otherwise might not be one."

McSwane's argument premised on Ind. Code § 35–47–7–1 is waived because it was not raised below and was instead raised for the first time in McSwane's appellate brief.[5] *See Carr v. Pearman,* 860 N.E.2d 863, 871 n. 3 (Ind.Ct.App.2007) (appellant who presents an issue for the first time on appeal waives the issue for purposes of appellate review), *trans. denied* 869 N.E.2d 462 (Ind.2007). We accordingly affirm summary judgment for Dr. Eelma.

### 2. *The Hospital's Duty*

■ The Hospital was not entitled to summary judgment on the ground it had no duty to Malia. Whether there is a specific duty not to discharge a patient to the care of a suspected abuser is a question of first impression. We hold such a duty might sometimes be included in a hospital's general duty of care toward a patient, or in the alternative might arise by virtue of statutory requirements to report abuse of certain endangered adults. Therefore, under the facts before us summary judgment for the Hospital on the ground it had no such duty was error.

4. The trial court noted it would normally lack jurisdiction over a medical malpractice action prior to the entry of an opinion by a medical review panel, but that courts have limited jurisdiction to determine certain preliminary matters under Ind.Code § 34–18–11–1.

5. McSwane submitted a reply brief, but did not respond to the Doctor's assertion she waived this argument.

 Hospitals owe their patients a duty to exercise reasonable care in rendering hospital services; this includes a duty to safeguard the welfare of its patients from harm inflicted by third persons. *See generally* 41 C.J.S. *Hospitals* § 35 (2006). A hospital has a duty to protect a patient from dangers that might result from external circumstances peculiarly within the hospital's control. *Id.* The extent and character of the care a hospital owes its patients depends on the circumstances of each particular case, but is circumscribed by those risks that are reasonably foreseeable. *Id.*

On the question of a hospital's duty to protect patients from third persons, we find instructive *N.X. v. Cabrini Medical Center*, 97 N.Y.2d 247, 739 N.Y.S.2d 348, 765 N.E.2d 844 (2002). There N.X., a patient, sued the hospital for injuries she sustained when a surgical resident sexually assaulted her. The Court of Appeals held the patient could not recover under the doctrine of *respondeat superior*, but found summary judgment precluded by fact issues as to whether nurses who were present at the time of the assault failed to adequately protect N.X. The Court explained the scope of a hospital's duty:

> A hospital has a duty to safeguard the welfare of its patients, even from harm inflicted by third persons, measured by the capacity of the patient to provide for his or her own safety. This sliding scale of duty is limited, however; it does not render a hospital an insurer of patient safety or require it to keep each patient under constant surveillance. As with any liability in tort, the scope of a hospital's duty is circumscribed by those risks which are reasonably foreseeable.

*Id.*, 739 N.Y.S.2d 348, 765 N.E.2d at 848 (citations omitted). It found under "the settled hospital-patient duty equation" there were issues of fact as to whether nurses "actually observed or unreasonably ignored events immediately preceding the misconduct which indicated a risk of imminent harm" to N.X. that triggered the need for protective action. *Id.*

The hospital characterized the sexual assault of a patient by a physician having no known history of sexual misconduct as a risk so remote that, as a matter of law, it could not have been reasonably foreseeable. The Court rejected the hospital's use of that reasoning to avoid "liability for actually observed or readily observable misconduct committed in the very presence of hospital employees." *Id.* Thus, the question was whether the hospital's nurses had a duty to protect N.X. once there were acts or events suggesting an assault was about to take place. N.X. identified several unusual circumstances surrounding the resident's appearance in the recovery room that should have alerted the nurses that N.X. was in obvious jeopardy of imminent harm.

From "this confluence of factors" the Court found "a sufficient basis from which a jury could determine that the nurses unreasonably disregarded that which was readily there to be seen and heard, alerting them to the risk of misconduct" that could have been prevented. *Id.*, 739 N.Y.S.2d 348, 765 N.E.2d at 849.

The Court emphasized its holding did not establish a broader duty toward patients than that historically placed on hospitals:

> We simply hold that observations and information known to or readily perceivable by hospital staff that there is a risk of harm to a patient under the circumstances can be sufficient to trigger the duty to protect. This commonsense approach safeguards patients when there is reason to take action for their protection and does not burden the practice of

medicine or intrude upon the traditional relationship between doctors and nurses. *Id.*

■ McSwane, like *N.X.*, designated evidence of "actually observed or readily observable" conduct and information that could have alerted the Hospital there was a risk of harm to Malia. That evidence provided, as it did in *N.X.*, a sufficient basis from which a jury could determine the Hospital "unreasonably disregarded that which was readily there to be seen and heard," alerting it to the risk of misconduct that could have been prevented. Summary judgment for the Hospital in the case before us was therefore improper.

The standard articulated in *N.X.* is consistent with our explanation of the extent of a hospital's duty toward a patient in *Breese v. State*, 449 N.E.2d 1098 (Ind.Ct. App.1983), *superseded on other grounds by Ogle v. St. John's Hickey Memorial Hosp.*, 473 N.E.2d 1055 (Ind.Ct.App.1985), *reh'g denied, trans. denied. Breese* involved a wrongful death action arising from suicide by a patient in a mental hospital. Hospital personnel were made aware Breese had exhibited suicidal behavior while at another hospital by a statement in a "transfer record" and a phoned request for admission. The transfer record was a single sheet of paper that contained the statement "Persistent suicidal behavior—recommend full precautions." *Id.* at 1102.

Breese's father testified he told hospital personnel seven or eight times about his son's suicidal gestures or attempts at other hospitals. He offered to arrange to have friends and relatives watch Breese continuously if the staff could not properly watch him, but was assured the hospital could do so. Breese's admitting and treating physician diagnosed him as paranoid, schizophrenic, and suicidal and ordered suicidal precautions, but testified when Breese was admitted he was cooperative and seemed "almost optimistic." *Id.* However, in a document summarizing Breese's admission status, the doctor reported Breese was anxious and fidgeting around in the chair throughout the interview. At times he would raise his voice abruptly to an "anxious whine." *Id.* There was a "flat facial feature and flat tone of voice ... [Breese's] insight and judgment were both felt to be poor." *Id.* After Breese was admitted he ate well, talked with ward personnel and other patients, and took his medication without objection. But a visitor testified when he tried to visit Breese and was told to leave by an orderly, Breese seemed "kinda wild eyed." *Id.* A ward nurse noted that when Breese went to his room after dinner he had a strange look on his face. Breese later hung himself.

In addressing jury instructions, we articulated the scope of the hospital's duty in light of that conflicting evidence:

> The duty of a mental hospital to exercise reasonable care in the treatment of a patient with known suicidal tendencies is not disputed. [The hospital] argues that Breese's tendered instruction would have informed that jury that a mental hospital is required not only to use reasonable care in treating the patient for his illness, but also to safeguard him from self-inflicted injury or death, and that there is no basis in Indiana law for extending a mental hospital's duty beyond that of reasonable care. We disagree with [the hospital's] assertion that the tendered instruction extends the requisite standard.

> Breese's tendered instruction #7 does not place a duty upon a mental hospital to insure that a patient does not commit suicide; rather it would have informed the jury of the hospital's obligation to use reasonable care in performing two distinct functions: in treating the patient's illness, and in safeguarding the patient from self-inflicted injury or death. In addition, the ten-

dered instruction would have informed the jury of the effect that the hospital's knowledge of [Breese's] prior suicide attempts and methods used had upon its duty to exercise reasonable care.

\* \* \* \*

"While a hospital or sanitorium conducted for private gain is not an insurer of its patients against injuries inflicted by them, it is required to use ordinary care in the treatment and care thereof. In determining ordinary care in such cases it is proper to consider the physical and mental ailments of the patient which may affect his ability to look after his own safety."

*Id.* at 1103–04 (citations omitted).[6]

We believe a hospital's duty of reasonable care requires consideration of evidence its patient is a victim of domestic abuse,[7] just as it requires consideration of "the physical and mental ailments of the patient which may affect his ability to look after his own safety." *Id.* at 1104. Summary judgment for the Hospital in the case before us on the ground it owed Malia no duty was error.

McSwane also argues the Hospital assumed a duty to intervene in cases of suspected spousal abuse because it had a written policy to protect abuse victims and it trained its employees to separate abusers and their victims.[8] The policy, titled "Adult Abuse—Spouse or Significant Other," (App. at 938), has a stated purpose to "outline precautions and legal responsibilities to protect victims of adult abuse/spouse or significant other," *id.*, and to "protect all adult patients diagnosed as

---

**6.** While we rejected the hospital's objection to Breese's instruction, we found the instruction was appropriately refused on other grounds.

**7.** The dissent correctly notes *N.X.* and *Breese* involved injuries on hospital property and attributable to hospital employees, not injuries caused by a third party outside the hospital as in the case before us, and would distinguish those decisions on those bases. However, the duty recognized in those decisions was not premised, as the dissent suggests, on whether the *wrongdoer* was "under the hospital's control" or "physically located on Hospital grounds." (Op. at 258.) Rather, the duty was premised on whether there were "observations and information *known to or readily perceivable by hospital staff* that there is a risk of harm to a patient under the circumstances" that trigger a duty to protect the patient. *N.X.*, 739 N.Y.S.2d 348, 765 N.E.2d at 849 (emphasis supplied).

As explained above, McSwane designated ample evidence of such known or "readily perceivable" conduct and information that could have alerted the Hospital there was a risk of harm to Malia. We decline to hold a hospital with such information available to it has a duty to protect its patient only from those individuals with whom the hospital has an employer-employee relationship.

Nor, in this review of summary judgment for the Hospital, need we decide whether the Hospital was obliged, as the dissent suggests, to forcibly detain Malia by drugging her, placing her in restraints, or locking her in a room. We decide only that the trial court erred in concluding the Hospital could not, as a matter of law, have had a duty toward Malia. Whether in this case the information "known to or readily perceivable by" the Hospital gave rise to such a duty toward Malia, and whether the Hospital breached the duty, must be determined by the trier of fact upon presentation of the evidence. *See, e.g., Denison Parking, Inc. v. Davis*, 861 N.E.2d 1276, 1279 (Ind.Ct.App.2007) (negligence cases are particularly fact sensitive and are governed by a standard of the objective reasonable person-one best applied by a trier of fact after hearing all of the evidence), *trans. denied* 869 N.E.2d 462 (Ind.2007).

**8.** The Hospital asserts McSwane has waived this argument because she did not argue assumption of duty below and that argument is not available to her on appeal because she offered no authority in support of that premise. As explained below, the record does not permit our review of this argument. We therefore do not address McSwane's waiver.

victims of battering; suspected cases of battering and/or unexplained injuries in which battering is to be ruled out." (*Id.*) The policy requires Hospital workers to "report suspected cases of battery, neglect, or exploitation if the patient falls within the "endangered adult" guidelines. (*Id.*) "Report of abuse of independent adults is voluntary." (*Id.*)

██ The Hospital's "endangered adult" guidelines do not appear to be included in the Appendix,[9] and we are therefore unable to determine whether the Hospital might have assumed a duty pursuant to its own policy. However, our legislature has imposed statutory requirements which, like the Hospital policy, require reporting of suspected abuse of "endangered" adults. We believe there is a genuine issue of material fact as to whether, under the circumstances before us, those statutes gave rise to a tort duty on the Hospital's part toward Malia. Summary judgment was therefore improper on that ground.

A person who believes or has reason to believe an endangered adult is the victim of battery, neglect, or exploitation, but knowingly fails to report the facts supporting that belief to the appropriate social services or law enforcement entities, commits a Class B misdemeanor. Ind.Code § 35–46–1–13. An "endangered adult" is an individual who is 1) at least eighteen years of age; 2) unable by reason of a physical or mental incapacity of providing or directing the provision of self-care; and 3) harmed or threatened with harm as a result of neglect, battery, or exploitation of the individual's personal services or property. Ind.Code § 12–10–3–2.

██ Under traditional tort doctrines a violation of a statutory obligation may give rise to a civil damage claim. *Cantrell v. Morris,* 849 N.E.2d 488, 497 (Ind.2006). The Second Restatement of Torts supports a common law tort damage remedy for some statutory violations. It provides:

> When a legislative provision protects a class of persons by proscribing or requiring certain conduct but does not provide a civil remedy for the violation, the court may, if it determines that the remedy is appropriate in furtherance of the purpose of the legislation and needed to assure the effectiveness of the provision, accord to an injured member of the class a right of action, using a suitable existing tort action or a new cause of action analogous to an existing tort action.

*Id.* (quoting Restatement (Second) of Torts § 874A (1979)). To invoke this doctrine, a plaintiff must be a member of the class of citizens the statute is designed to protect. *Id.* Whether a civil damage claim is available depends on legislative intent. *Id.* at 497–98.

██ Our Indiana courts have a "long and continuous" history of recognizing negligence actions for statutory violations. *Kho v. Pennington,* 875 N.E.2d 208, 212 (Ind.2007). The unexcused violation of a statutory duty is negligence *per se* "if the statute or ordinance is intended to protect the class of persons in which the plaintiff is included and to protect against the risk of the type of harm which has occurred as a result of its violation." *Id.* at 212–13. The *Kho* Court noted the Restatement provides:

9. Nor does the Hospital acknowledge in its Statement of Facts that it has such a policy. It addresses the policy in its argument the adoption of the policy does not amount to an assumption of duty, but does not direct us to the policy in the Appendix, nor does it indicate the pertinent language of the policy.

The court may adopt as the standard of conduct of a reasonable man the requirements of a legislative enactment or an administrative regulation whose purpose is found to be exclusively or in part (a) to protect a class of persons which includes the one whose interest is invaded, and

(b) to protect the particular interest which is invaded, and

(c) to protect that interest against the kind of harm which has resulted, and

(d) to protect that interest against the particular hazard from which the harm results.

*Id.* (quoting Restatement (Second) of Torts § 286).

Section 35–46–1–13 meets that standard. We are directed to no Indiana decisions explicitly addressing whether a violation of the duty fixed by Ind.Code § 35–46–1–13 is negligence *per se.* We find instructive *Sabia v. State,* 164 Vt. 293, 669 A.2d 1187 (1995), where sexual abuse victims sued a state agency for failure to protect them from further abuse after repeated reports of abuse. The trial court granted judgment on the pleadings in favor of the state, but the supreme court held the agency had a tort duty to protect the victims from continued abuse.

A Vermont statute provided the agency *shall* commence an investigation after receipt of a report of child abuse, *shall* seek to determine the identity of the abuser and the risk if the child remains in the existing home, and, if the investigation produces evidence of abuse or neglect, the agency *shall* provide assistance to the child. The stated purposes of those provisions was to protect children whose health and welfare may be adversely affected through abuse or neglect, to strengthen the family and make the home safe for children, and to provide a nurturing and safe environment for children. The *Sabia* court found it "beyond dispute that the relevant statutory provisions create a duty on the part of [the agency] to assist a particular class of persons to which plaintiffs belong and to prevent the type of harm suffered by plaintiffs." *Id.* at 1192.

Our legislature offers no explicit statement of the purpose of chapter 35–46–1, "Offenses against the Family," but it is apparent it is intended to "protect the class of persons in which the plaintiff is included [*i.e.,* endangered adults as defined in Ind.Code § 12–10–3–2] and to protect against the risk of the type of harm which has occurred as a result of its violation [*i.e.,* battery, neglect, or exploitation as defined elsewhere in the code]." *See Kho,* 875 N.E.2d at 212–13.

There was evidence before the trial court that Malia was, in the space of a few hours while she was at the Hospital, given a general anesthetic, a relaxant, and numerous doses of various opiates for pain, and was advised by the Hospital not to make any important decisions. As explained below, this gives rise to a genuine issue of material fact as to whether her "mental condition and/or physical incapacities" were properly taken into account in addressing her contributory negligence.

For the same reason, we find a genuine issue of material fact as to whether Malia might have been an "endangered adult" by virtue of her "physical or mental incapacity of … providing or directing the provision of self-care; and … harmed or threatened with harm as a result of.: battery," Ind.Code § 12–10–3–2(b), and if so, whether the Hospital was negligent *per se* for failure to properly report, pursuant to Ind. Code § 35–46–1–13, that Malia might have been a victim of battery. Summary judgment for the Hospital was accordingly improper on that ground.

### 3. Contributory Negligence

Both sides asked the trial court for a preliminary determination regarding contributory negligence, and the court found that even if the Hospital owed Malia a duty and breached it, Malia's own actions were a complete bar to recovery.

In most Indiana actions for negligence, a plaintiff's contributory fault does not bar recovery unless it exceeds fifty percent of the total fault proximately contributing to the damages. Otherwise, it operates only to reduce a plaintiff's damages in proportion to fault. Ind.Code § 34-51-2-5, -6; *Funston v. School Town of Munster*, 849 N.E.2d 595, 598 (Ind. 2006). However, the Indiana Comparative Fault Act expressly excludes application to medical malpractice actions, Ind.Code § 34-51-2-1, so the common law defense of contributory negligence remains available to the Hospital and Doctor. Therefore, even a slight degree of negligence on Malia's part, if proximately contributing to her claimed damages, will operate as a total bar to McSwane's action. *See Funston*, 849 N.E.2d at 598.

Contributory negligence is generally a question of fact and is not an appropriate matter for summary judgment if there are conflicting factual inferences. *Id.* at 599. But where the facts are undisputed and only a single inference can reasonably be drawn therefrom, the question of contributory negligence becomes one of law. *Id.*

The trial court noted Malia had opportunities to inform the Hospital staff her injuries were not from a fall, yet she consistently told the staff her injuries were from a fall. She was told she could remain at the Hospital rather than leave with

Monty, but she left with him. However, we believe Malia's contributory negligence is a factual issue inappropriate for summary judgment because her physical and mental condition were not adequately taken into account.

A plaintiff is contributorily negligent when her conduct falls below the standard to which she should conform for her own protection and safety. *Id.* Lack of reasonable care that an ordinary person would exercise in like or similar circumstances is the factor on which the presence or absence of negligence depends. *Id.* Expressed another way, contributory negligence is the failure of a person to exercise for her own safety that degree of care and caution an ordinary, reasonable, and prudent person in a similar situation would exercise. *Id.* at 599. A patient may be contributorily negligent if she gives her doctor false or incomplete information when she is capable of providing an accurate history. *Fall v. White*, 449 N.E.2d 628, 633 (Ind.Ct.App.1983).

Departure from that general rule is required where the plaintiff is suffering from physical infirmities that impair her ability to function as an ordinary reasonable person: "The proper test to be applied in such cases is the test of a reasonable person under the same disabilities and infirmities in like circumstances. On the issue of contributory negligence, mental condition and/or physical incapacities are factors to be considered." *Memorial Hospital of South Bend, Inc. v. Scott*, 261 Ind. 27, 36, 300 N.E.2d 50, 56 (1973).

After Malia arrived at the hospital she was given three doses of Dilaudid.[10] Before her surgery Malia was given two milli-

---

**10.** Dilaudid is a trade name for a synthetic derivative of morphine used as a respiratory sedative and analgesic that is more potent than morphine. http://dictionary.reference.com/browse/hydromorphonehydrochloride (last visited November 13, 2007).

grams of Versed, which is "a customary pre-op medication ... [t]o relax the patient before they [sic] go into surgery." (App. at 255.) About fifteen minutes later she was given a general anesthetic for her surgery. The instructions the Hospital gave her concerning the anesthetic indicated the anesthetic would be active in her body for twenty-four hours and she should not drive, operate machinery, or "make any important decisions such as signing any important papers." (*Id.* at 180.) After surgery she was given two doses of morphine as pain medication.

We acknowledge the absence in the record of any designated evidence Malia was, because of the medication, not competent to make the decisions she made. But in light of the evidence Malia was, in the space of a few hours while she was at the Hospital, given a general anesthetic, a relaxant, and numerous doses of various opiates for pain, and was therefore advised by the Hospital not to "make any important decisions," we believe there is a genuine issue of material fact as to whether her "mental condition and/or physical incapacities" were properly taken into account in addressing her contributory negligence. *Scott*, 261 Ind. at 36, 300 N.E.2d at 56. Summary judgment on that ground was inappropriate.

## CONCLUSION

■ A hospital has a statutory duty to report suspected abuse of an endangered adult, and its independent duty to safeguard its patient from dangers that might result from circumstances within the hospital's control extends to the discharge of a patient into the custody of the person who allegedly inflicted the injuries that necessitated her hospitalization. The Hospital therefore should not have been granted summary judgment on the ground it owed Malia no duty. In light of the conflicting factual inferences as to Malia's contributory negligence, summary judgment for the Hospital on that ground was also improper.

Affirmed in part, reversed in part, and remanded.

ROBB, J., concurs.

BAKER, C.J., dissents with opinion.

BAKER, Chief Judge, dissenting.

I must dissent from the majority's conclusion that the Hospital had a duty to Malia to refuse to discharge her to the care of her husband. In imposing this astonishingly broad duty upon medical caregivers, the majority essentially relies upon two rationales—the endangered adult statute and common law tort cases.[11] I find both rationales to be fundamentally flawed.

### I. The Endangered Adult Statute

In concluding that the Hospital may have had a duty to prevent Malia from leaving its facility, the majority relies in part upon Indiana Code section 35–46–1–13, which is a criminal statute providing that a person who believes or has reason to believe an endangered adult is the victim of, among other things, battery, but knowingly fails to report his or her suspi-

---

11. It is not entirely evident from the majority's opinion whether it also relies on the Hospital's policy to protect abuse victims in arriving at its conclusion. To the extent that it does, I vehemently disagree that such a policy can or should give rise to liability. We should *encourage* entities such as hospitals to adopt policies regarding domestic violence victims and to train their employees to handle such situations. To impose liability based on an entity's alleged failure to follow its policy would be to *discourage* the adoption of such policies in the future. I do not believe that to be in anyone's best interest, least of all the victims of domestic violence.

cions to the appropriate social services or law enforcement entities, commits a class B misdemeanor. An "endangered adult" is someone who is at least eighteen years old, is unable by reason of a physical or mental incapacity of providing or directing the provision of self-care, and harmed or threatened with harm as a result of, among other things, battery of the individual's personal services or property. Ind. Code § 12–10–3–2.

The majority finds that there is a genuine issue of material fact regarding Malia's mental acuity at the time of her discharge from the Hospital. It bases this conclusion on the fact that she received a number of pain medications and other drugs during her time as a patient in the Hospital. The majority, however, conveniently ignores the fact that the *undisputed* testimony in the record establishes that at the time of her discharge, Malia was coherent, competent, and in no way incapacitated.

The undisputed testimony establishes that after Malia's surgery, she quickly regained consciousness and became alert and coherent. Brian Guzik, the nurse who was assigned to care for Malia following her surgery and who spent the vast majority of her post-surgery time in her room, testified that Malia was "alert and oriented. I mean she was ... very aware [of] what was going on.... I mean she followed commands very well. Ask her a question, she'd answer appropriately." Appellant's App. p. 120.

Malia's surgeon, after explaining that different anesthetic medications wear off of different people at differing rates, testified that following the surgery, Malia "was alert, oriented, demanding things, requesting that doctors be called. This was a person in my opinion that probably was very capable of making her own decisions." *Id.* at 263. The surgeon acknowledged that she was not with Malia at this time

but was confident of her opinion based on descriptions she had received from other Hospital employees and the fact that Malia had demanded that she receive Oxycontin rather than Darvocet, the pain medication normally prescribed following surgery, resulting in a phone call to the surgeon at home. *Id.* at 257.

After Malia was discharged, she was pushed in a wheelchair out of the Hospital. She was accompanied by, among others, her husband, her mother, two nurses, and security personnel. As the group walked through the halls and reached the door, Malia's mother begged her daughter not to go home with Monty. It is evident and undisputed that Malia had possession of her faculties, inasmuch as she got into a screaming match with her mother. According to Guzik,

> the mother was telling the patient don't go home with him, don't go home with him. And then ... [Malia] went ballistic on her mom.... I remember her going ballistic. Dropping a lot of F bombs .... she was telling her mom to f*ck off. I remember her saying that she was in her business too much. I think she said something to her mom that she is [as] dead to her as her dad, as being the patient's dad. She, actually she used the F word quite a bit.

*Id.* at 126. Another nurse who accompanied the group out of the Hospital agreed with Guzik's description, testifying that in response to her mother's pleas, Malia "told [her mother] to stay out of their business" and used "quite a bit of profanity" in the process. *Id.* at 378.

The security officers also agreed. Ronald Harris testified that he "heard the daughter say ... tell the mom to stay the f*ck out of my life, and leave me alone, I'm going with him." *Id.* at 507. Ronald Keene testified that if Malia "freely wants to go with him, I can't stop her. She's an

adult, and she obviously knows what she's saying.... [S]he seemed to have all of her faculties and everything." *Id.* at 536. Keene also stated that in response to her mother's pleas not to go with her husband, "she said, leave me the f\*ck alone. And something like, get the f\*ck out of my life." *Id.* at 539. Keene told McSwane that "as long as [Malia] wishes to leave with him and she's aware of what she's doing, and the doctor has released her, then ... she can leave." *Id.*

Thus, the undisputed evidence in the record establishes that, notwithstanding the anesthesia and pain medications Malia had received while in the Hospital, she was alert, competent, coherent, and fully capable of making her own decisions at the time she was discharged. At that time, she had an entirely coherent—albeit profane—conversation with her mother in which she made it perfectly clear that she wanted to go home with her husband. There is simply *no* support in the record for the majority's conclusion that there is a question of fact regarding Malia's mental faculties at the time she was discharged from the Hospital. Given that the record definitively establishes that Malia was not incapacitated, to hold that she could be considered an endangered adult merely because she wanted to leave with her abusive husband is insulting, demeaning, chauvinistic, and paternalistic. I strongly believe this holding to be erroneous.

## II. Common Law

The majority relies on two cases from other jurisdictions in arriving at the conclusion that the Hospital's duty of care to Malia extended to a point of preventing her from leaving the facility with her husband. I find these cases to be distinguishable. In *N.X.*, the patient was assaulted in the hospital by one of the hospital's surgical residents. 739 N.Y.S.2d 348, 765 N.E.2d at 846–47. And in *Breese*, the patient committed suicide while in the hospital under the direct care of hospital personnel. 449 N.E.2d at 1102. Here, in contrast, Malia's death occurred at the hand of a third party after she had already exited the Hospital and driven away. I simply cannot conclude that the Hospital's duty of reasonable medical care to its patients extends to such lengths—protection from a person not under the Hospital's control while not physically located on Hospital grounds.

It may be that, as the majority insists, these cases were premised in part on whether there was information known to or readily perceivable by hospital staff that there was a risk of harm to a patient. Op. p. 252 n. 7. I disagree, however, with the implication that the presence of information is the only salient fact contained in those opinions. I believe that the fact that the harm occurred to the patients while they were under the direct control of the medical caregivers at issue is implicitly significant and, as stated above, I believe that this fact suffices to distinguish those cases from the circumstances herein.

Here, the evidence establishes that the Hospital gave Malia every chance, while in the Hospital's care, to report Monty's abuse. Malia was given the chance to remain at the Hospital rather than leave in Monty's care. Hospital security employees responded to all calls from staff that Malia might have been a victim of domestic violence and assessed Monty for weapons and inebriation before he left the premises.

I have seen no authority persuading me that the Hospital's duty of reasonable medical care to Malia extends to a point of forcibly detaining her against her will. To require the Hospital to guarantee the safety of its patients after they walk out of its doors is to raise a host of impossible questions—should the Hospital have forced

Malia into a locked room? Placed her in restraints? Drugged her? How far does this duty extend—if Monty had killed Malia a week after her Hospital visit, would that still fall in the scope of the Hospital's duty of care? What if, rather than killing her, he had slapped her? Could she have sued the Hospital for damages? This rule is untenable and poor public policy, and I believe that, as a matter of law, the Hospital did not have a medical duty to refuse to discharge Malia to Monty's care.

The majority insists that we need not decide how far the duty extends. My response is simply that before we impose a duty on any person or entity, we must determine that the duty can, in fact, be performed in a reasonable manner. To hold otherwise—to impose a duty that cannot be fulfilled—is to place our tort system in a kangaroo court. Malia's mother begged and pleaded with her daughter to refrain from leaving with Monty. Malia responded with profanities. The police told Malia's mother that they would not come to the Hospital because "there was nothing they could do. . . . [T]hey couldn't charge him with anything at that point." Appellant's App. p. 471. The security officer testified that he told Malia's mother that

> if she's been released from the hospital, and she wishes to go with him, there's . . . and he's showing no threat of any kind, there's nothing I can do if she wants to go. I cannot hold her. Unless there's any evidence that . . . of her endangerment, there's nothing I can do. If she wants to leave, she can leave.

*Id.* at 536. As noted above, there was *no* evidence of Malia's endangerment. If Malia's own mother was unsuccessful and there was nothing that Hospital security officers or the police could or would do, I simply do not believe that there is any evidence in the record supporting a conclu-sion that the Hospital could have prevented Malia from leaving with her husband short of physically restraining her—possibly unlawfully. Under these circumstances, it would be unfair, unjust, and unreasonable to say that the Hospital faces potential liability for its actions.

As a final matter, I note that the State of Indiana offers many protections to victims of domestic violence and many punishments for the perpetrators of such violence. Depending on the factual circumstances, a person who commits an act of domestic violence can be convicted of, among other things:

- Battery. Ind.Code § 35–42–2–1 (increasing the crime to a class D felony if committed by an adult against a child less than 14 years of age, to a class B felony if the act caused serious bodily injury, and to a class D felony if committed by a person who has been previously convicted of battery against the same victim).

- Domestic Battery. I.C. § 35–42–2–1.3 (increasing the crime to a class D felony if committed by a person who has a prior conviction for that crime).

- Aggravated Battery. I.C. § 35–42–2–1.5.

- Invasion of Privacy. Ind.Code § 35–46–1–15.1 (increasing the crime to a class D felony if committed by a person with a prior unrelated conviction for invasion of privacy).

- Criminal Trespass. Ind.Code § 35–43–2–2.

- Intimidation. Ind.Code § 35–45–2–1 (increasing the crime to a class D felony if it involves a witness or spouse or child of a witness in any pending criminal case against the person making the threat).

- Harassment. I.C. § 35–45–2–2.

- Stalking. I.C. § 35–45–10–5 (increasing the crime to a class C felony if it involves a threat placing the victim in fear of sexual battery, serious bodily injury, or death, is in disregard of a protective order, or occurs while a criminal case of stalking against the same victim is pending in court; increasing the crime to a class B felony if it occurs while the offender is armed with a deadly weapon or if the offender has a previous conviction of stalking the same victim).
- Kidnapping. I.C. § 35–42–3–2.
- Criminal Confinement. I.C. § 35–42–3–3 (increasing the crime to a class C felony if the confinement involves a child less than 14 years of age who is not the child of the offender).
- Interference with Custody. I.C. § 35–42–3–4.
- Rape. I.C. 35–42–4–1.
- Interference with Reporting of a Crime. I.C. § 35–45–2–5.
- If law enforcement officers have probable cause, they can make an on-scene, warrantless arrest for battery, domestic battery, or invasion of privacy. Ind.Code § 35–33–1–1. Victims are not required to sign an affidavit for an arrest to be made and an officer does not have to witness the suspect violating a protective order for the arrest to occur.

Indiana takes acts of domestic violence very seriously, as evidenced by the myriad ways in which offenders can be punished. In arriving at my conclusion herein, I neither intend to diminish the seriousness of this type of offense nor, of course, to condone Monty's heinous and unforgiveable actions. But there is nothing in the record or in Indiana law that leads me to conclude as a matter of law that the Hospital had a duty to prevent Malia from leaving with her husband. I believe that the majority's holding herein will discourage medical caregivers from adopting domestic violence policies and result in higher health insurance costs and longer waits for patients seeking treatment and hoping to be discharged following treatment. Thus, I would affirm the trial court's judgment in favor of the Hospital.