Monica JOYNER—WENTLAND,
M.D., Appellant–Defendant,

v.

Pamela J. WAGGONER,
Appellee–Plaintiff.

No. 49A02–0710–CV–878.

Court of Appeals of Indiana.

July 17, 2008.

Jon M. Pinnick, Donald B. Kite, Sr., Schultz & Pogue, LLP, Indianapolis, IN, Attorneys for Appellant.

Caroline A. Gilchrist, Baker & Gilchrist, P.C., Avon, IN, Attorney for Appellee.

## OPINION

KIRSCH, Judge.

Monica Joyner—Wentland, M.D. ("Dr. Joyner—Wentland") appeals a jury verdict in favor of Pamela J. Waggoner ("Waggoner") in a medical malpractice case arising from Dr. Joyner—Wentland's failure to order a pre-surgery mammogram before breast augmentation surgery. Dr. Joyner—Wentland raises the following restated issue: whether the trial court abused its discretion in failing to give her tendered final jury instructions on contributory negligence given Waggoner's admission that she provided incorrect information regarding the date of her last mammogram prior to her surgery.

We affirm.[1]

### FACTS AND PROCEDURAL HISTORY

On May 15, 2002, Waggoner went to the office of Dr. Joyner—Wentland for an initial plastic surgery consultation. Waggoner specifically sought information regarding a mastopexy, also known as a breast lift. When she arrived, Waggoner filled out various forms, including a demographic information sheet, a medical history form, and forms relating to financial policies. In her paperwork, Waggoner stated that her primary care physician was Dr. James Myers. Dr. Myers was actually her OB/GYN, and her primary care physicians were Drs. Pizzato and Maynard. After finishing the paperwork, Waggoner met with Amy Schwab, a certified surgical technician/patient care coordinator. During this meeting, Waggoner advised Schwab that her last mammogram had been in May 2000 and that it had been normal. *Ex. Vol. III, Joint Stipulated Ex. 2 at 12.* Waggoner also told Schwab that

---

1. Oral argument was held in this case on June 26, 2008 in Indianapolis, Indiana. We commend counsel on the on the quality of both their written and oral advocacy.

she was fifty years old, smoked one pack of cigarettes per day, and did not have breast asymmetry, a history of breast cysts or masses, or a family history of breast cancer. *Id.* Although Waggoner reported the correct location of her most recent mammogram and the physician who ordered it, she was incorrect about the date. The mammogram had been performed in 1997, not 2000.

After speaking with Schwab, Waggoner was examined by Dr. Joyner—Wentland. The doctor physically examined Waggoner's breasts, took measurements, and lifted the breasts to show how they would look after the surgery. Dr. Joyner—Wentland told Waggoner that she would need implants to make her breasts look proper and explained the surgery, along with potential risks and complications. Dr. Joyner—Wentland did not order a mammogram for Waggoner on this date or at a subsequent pre-surgery appointment on May 28, 2002 because Waggoner had reported that she had undergone a mammogram in May of 2000 and because she reported having a primary care physician, whose purview it was to order such a test. *Tr.* at 623.

On June 4, 2002, Dr. Joyner—Wentland performed breast surgery on Waggoner. During the surgery, Dr. Joyner—Wentland discovered some tissue in Waggoner's right breast (a little over a centimeter in size) that felt firmer than the surrounding tissue. The doctor removed the tissue and sent it to pathology and then completed the surgery. When Dr. Joyner—Wentland met with Waggoner two days after the surgery, she did not advise Waggoner that suspicious tissue had been removed from her breast. On June 20, 2002, after receiving a pathology report confirming that the removed tissue was cancerous, Dr. Joyner—Wentland notified Waggoner of the removal and result. This was the last time that Dr. Joyner—Wentland saw Waggoner.

Shortly thereafter, on August 6, 2002, Waggoner saw Dr. Kathy Miller, an oncologist at the Indiana University Medical Center, specializing in the diagnosis and treatment of breast cancer. Dr. Miller told Waggoner that they "were in a difficult situation because of the very high likelihood that additional tumor was left in the breast." *Id.* at 471. Dr. Miller also stated that because Waggoner had not had a mammogram before her surgery, there was no way to know where in the breast the remaining cancer cells might have been, so there was no choice but to recommend a mastectomy. *Id.* at 471–72.

On October 15, 2002, Dr. Robert Goulet performed a mastectomy and lymph node dissection. Because Dr. Joyner—Wentland had not changed her gloves and the tumor had been transected during the original breast surgery, Dr. Goulet had to address his concern that part of the breast as well as the incisions had the potential to be "involved with tumor cells." *Id.* at 317. He therefore performed a mastectomy that removed the skin from the lower half of the breast, which included all of the incisions from Waggoner's previous plastic surgery; this procedure in turn affected the reconstruction process. Plastic surgeon Dr. Rajiv Sood began reconstruction of Waggoner's right breast in conjunction with Dr. Goulet's surgery.

The second stage of the reconstruction process occurred on July 15, 2003. At that time, Dr. Sood placed a permanent implant in Waggoner's right breast and redid the left mastoplexy in order to match both sides. At follow-up visits after the surgery, Dr. Sood was concerned about possible infection, delayed healing of Waggoner's wounds, and skin necrosis (skin death). On October 22, 2003, Waggoner was hospitalized because of a possible im-

plant infection. Subsequently, Waggoner underwent further reconstruction in September 2004, February 2005, February 2006, and May 2006.

Waggoner filed a complaint against Dr. Joyner—Wentland on September 8, 2005, alleging that the doctor was negligent in failing to order a pre-surgery mammogram, performing the surgery incorrectly, and managing her post-operative care. Prior to this filing, a medical review panel was formed to review the case, and reached the following opinion on June 30, 2005: "The panel is of the unanimous opinion that the evidence supports the conclusion that the defendant failed to comply [with] the appropriate standard of care by not obtaining a timely mammogram report, but that it cannot be determined whether that was a factor of any resultant damage." *Ex. Vol. I, Pl.'s Ex.* 1. A jury trial was held on Waggoner's complaint on September 11 through September 14, 2007. Prior to trial, and again at the close of all evidence, Dr. Joyner—Wentland tendered her proposed final jury instructions to the trial court, which included the following two instructions on contributory negligence:

**Final Jury Instruction No. 6**

The patient has a duty to exercise reasonable care in providing the defendant with accurate and complete information. If the defendant has proved by a preponderance of the evidence each of the following:

(1) The plaintiff failed to provide accurate and complete information to the defendant;

(2) A reasonable prudent person in the same or similar circumstances would have provided accurate and complete information to the defendant; and

(3) The plaintiff's failure to provide accurate and complete information to the defendant proximately caused plaintiff's injury;

Then your verdict should be for the defendant.

**Final Jury Instruction No. 8**

The question of contributory negligence by the plaintiff is an issue in this case. Contributory negligence is the failure of a plaintiff to use reasonable care. If the plaintiff's negligence proximately contributed to her injury or damage, then the plaintiff cannot recover even though the defendant may have been negligent. The defendant has the burden of proving by a preponderance of the evidence that the plaintiff was negligent.

*Appellant's App.* at 31, 33. The trial court refused to give these two instructions over the objection and argument of Dr. Joyner—Wentland. At the conclusion of the trial, the jury returned a verdict in favor of Waggoner and awarded damages in the amount of $1,315,000, which was later remitted to the statutory cap of $1,250,000 [2] upon the doctor's motion. Dr. Joyner—Wentland now appeals.

## DISCUSSION AND DECISION

 "[T]he purpose of an instruction is to inform the jury of the law applicable to the facts without misleading the jury and to enable it to comprehend the case clearly and arrive at a just, fair, and correct verdict." *Estate of Dyer v. Doyle,* 870 N.E.2d 573, 581 (Ind.Ct.App.2007), *trans. denied.* We review a trial court's decision to give or refuse a tendered instruction for an abuse of discretion. *Bailey v. State Farm Mut. Auto. Ins. Co.,* 881 N.E.2d 996,

---

**2.** IC 34–18–14–3(a)(3) limits the total amount recoverable for an injury or death resulting from an act of medical malpractice occurring after June 30, 1999 to $1,250,000.

1005 (Ind.Ct.App.2008). When reviewing a trial court's decision to give or refuse a tendered instruction, we consider whether the instruction (1) correctly states the law, (2) is supported by the evidence in the record, and (3) is covered in substance by other instructions. *Id.* (citing *Wal—Mart Stores, Inc. v. Wright*, 774 N.E.2d 891, 893 (Ind.2002)). "Even if a trial court abuses its discretion in refusing to give an instruction, such a refusal 'is not presumed fatal and will constitute reversible error only when substantial rights have been adversely affected.'" *Id.* (quoting *Hoosier Ins. Co. v. N.S. Trucking Supplies, Inc.*, 684 N.E.2d 1164, 1173 (Ind.Ct.App.1997)).

▆▆▆ "The Indiana Comparative Fault Act replaced the defense of contributory negligence, which completely bars a plaintiff from any recovery, with a system providing for the reduction of a plaintiff's recovery in proportion to the plaintiff's fault...." *Cavens v. Zaberdac*, 849 N.E.2d 526, 529 (Ind.2006). The Act, however, does not apply to cases alleging medical malpractice and, instead, preserved contributory negligence as a medical malpractice defense. *Id.* A plaintiff is contributorily negligent when her conduct falls below the standard to which she should conform for her own protection and safety. *McSwane v. Bloomington Hosp. and Healthcare Sys.*, 882 N.E.2d 244, 255 (Ind.Ct.App.2008). Contributory negligence is the failure of a person to exercise for her own safety that degree of care and caution an ordinary, reasonable, and prudent person in a similar situation would exercise. *Id.* Contributory negligence must be the proximate cause of the plaintiff's injury in order to constitute a complete bar to recovery. *Stowers v. Clinton Cent. Sch. Corp.*, 855 N.E.2d 739, 746 (Ind.Ct.

App.2006), *trans. denied* (2007). The contributory negligence must unite in producing the injury and be simultaneous with the fault of the defendant. *Cavens*, 849 N.E.2d at 531. "A patient may be contributorily negligent if she gives her doctor false or incomplete information when she is capable of providing an accurate history." *McSwane*, 882 N.E.2d at 255 (citing *Fall v. White*, 449 N.E.2d 628, 633 (Ind.Ct.App.1983)).

▆▆ Dr. Joyner—Wentland argues that the trial court abused its discretion when it refused to give her tendered final jury instructions pertaining to Waggoner's contributory negligence. She specifically claims that the tendered instructions were supported by sufficient evidence in the record.[3] The determination of whether there was evidence to support giving the instructions is a sufficiency question, and "Indiana cases dealing with the quantum of evidence necessary for the giving of an instruction indicate that there only need be evidence and reasonable inferences therefrom, which, when viewed in the light most favorable to the proponent, would support a jury verdict in the theory contained in the instruction." *Shull v. B.F. Goodrich Co.*, 477 N.E.2d 924, 927 (Ind.Ct.App. 1985), *trans. denied.*

Dr. Joyner—Wentland contends that the evidence presented that supported giving the instructions included Waggoner's testimony that, when she completed her patient information form at her May 15, 2002 consultation with Dr. Joyner—Wentland, she unintentionally supplied inaccurate information as to the date of her last mammogram by stating that it had occurred in May 2000 when it actually was on February 13, 1997. *Tr.* at 219–20, 260,

---

**3.** Dr. Joyner—Wentland also argues that her proposed final instructions were correct statements of the law. Because Waggoner concedes that the proposed final jury instructions were correct statements of the law, we do not address this issue.

356–58, 378, 381–82. Dr. Joyner—Wentland then performed Waggoner's breast surgery without first ordering a current mammogram. We disagree that the evidence presented at trial supported giving Dr. Joyner—Wentland's proposed jury instructions.

At trial, Drs. Goulet, Sood, Miller, and Christine Kelley all testified that the American Cancer Society ("ACS") guidelines recommend annual mammograms for women over the age of fifty. *Tr.* at 280–81, 419, 453–54; *Ex. Vol. II, Ex.* 8 at 21.[4] Dr. Kelley, who was a plastic surgeon, testified that the ACS guidelines constituted the standard of care for plastic surgeons. *Tr.* at 420. She also testified that the medical review panel, of which she was a member, had concluded unanimously that Dr. Joyner—Wentland's failure to order a pre-surgery mammogram was a breach of the standard of care. *Tr.* at 415–16. In his testimony, Dr. Goulet stated that Dr. Joyner—Wentland's failure to order a mammogram before performing surgery constituted a breach of the standard of care and that, given the fact that Waggoner was over fifty when the surgery was performed, "a two-year hiatus . . . certainly would warrant a preoperative evaluation with a mammogram." *Id.* at 322. Dr. Sood, a plastic surgeon, testified that he would require a pre-surgery mammogram for a woman over the age of fifty who had not had one in two years and that not doing so would be a breach of the standard of care. *Ex. Vol. II, Ex.* 8 at 27.

Additionally, Dr. Miller testified that it is important to order a pre-surgery mammogram because surgery can change the architecture of the breast and implants can make mammography more difficult and obscure the detection of breast cancer. *Tr.* at 509–10. Both Dr. Kelley and Dr. Sood testified that because of the healing time involved after breast surgery, it is best that a patient not undergo a mammogram for three to six months after surgery. *Id.* at 423; *Ex. Vol. II, Ex.* 8 at 25.

Drs. Goulet and Miller further testified that whether Waggoner's previous mammogram had been two years or five years prior to her surgery was irrelevant because the time period was greater than a year, and therefore, Waggoner was overdue for such a test. *Tr.* at 322, 508. In her testimony, Dr. Kelley stated that the medical review panel deemed it insignificant whether Waggoner's last mammogram had been two or five years prior, because the panel "felt that the more appropriate time interval to consider would have been one year." *Id.* at 418.

Further, Dr. Joyner—Wentland presented no evidence that she would have done anything differently had she known that Waggoner's previous mammogram had been five years earlier and not two years as stated on her medical information form. In her testimony, Dr. Joyner—Wentland confirmed that the ACS guidelines recommended annual mammograms for women over fifty and that her own policy was to order such a test if it had been greater than two years or if the patient did not have a relationship with a primary care physician whose purview it is to order a mammogram.[5] According to

---

4. In fact, these doctors all testified that, in 2002 at the time when Waggoner consulted with Dr. Joyner—Wentland, the guidelines actually recommended annual mammograms for women over the age of forty.

5. Although Waggoner did report having a primary care physician on her patient informa-

tion form, Dr. Joyner—Wentland testified that there was nothing in Waggoner's chart that indicated when Waggoner had last seen her primary care physician and she did not inquire as to when Waggoner had last seen him. *Tr.* at 695–96.

the information supplied by Waggoner, the date of Waggoner's surgery would have been over two years since her last mammogram, and Dr. Joyner—Wentland's own guidelines indicated that a new mammogram should have been ordered.

Evidence was also presented that Dr. Joyner—Wentland had previously encountered suspicious tissue during a breast procedure two other times, but did not change her practice on obtaining annual mammograms even when the patient was over the age of fifty. *Tr.* at 707. Furthermore, Dr. Joyner—Wentland testified that she had never declined to perform a breast procedure on a patient because the patient did not have a current mammogram. *Id.* at 693.

Our Supreme Court considered the convergence of the negligence of both the patient and the physician in medical malpractice cases in *Cavens v. Zaberdac,* 849 N.E.2d 526 (Ind.2006) and noted that such cases often turn upon whether the patient's alleged negligent conduct was a proximate cause of the claimed injuries: "[I]n order to constitute a bar to recovery, contributory negligence must be a proximate cause of the injury. It must unite in producing the injury, and thus be 'simultaneous and cooperating with the fault of the defendant ... (and) enter into the creation of the cause of action.'" *Id.* at 531 (quoting *Harris v. Cacdac,* 512 N.E.2d 1138, 1139—40 (Ind.Ct.App.1987), *trans. denied* (quoting 61 Am.Jur.2d *Physicians and Surgeons* § 302, at 449 (1981))) (other included citations omitted). The Court continued, "[t]he law is not concerned with the existence of negligence in the abstract; the law is only concerned with negligence that is the proximate cause of the injury

complained of by the plaintiff." *Id.* at 530 (quoting *Eiss v. Lillis,* 233 Va. 545, 553, 357 S.E.2d 539, 543 (1987)).

So, too, here. The evidence at trial was overwhelming that Waggoner's incorrect information on her intake sheet about the date of her last mammogram did not contribute to her injuries. The standard of care was that mammograms should be performed annually for women over fifty years old, and although Waggoner gave inaccurate information as to the date of her last mammogram, this information still reflected that Waggoner was due for a pre-surgery mammogram under this standard. Dr. Joyner—Wentland did not demonstrate that she would have done anything differently if she had been given the correct information. Finally, even under Dr. Joyner—Wentland's policy of performing mammograms every two years, Waggoner was overdue for a mammogram on the date of her surgery. The evidence at trial did not support a claim that Waggoner's mistake in reporting when her last mammogram occurred contributed to her injuries. Accordingly, the trial court did not abuse its discretion in refusing to give Dr. Joyner—Wentland's proposed instructions.[6]

Affirmed.

FRIEDLANDER, J., and BAILEY, J., concur.

---

**6.** Because we have concluded that Dr. Joyner—Wentland's tendered instructions were not supported by the evidence presented at trial, we do not address her argument that the tendered instructions were not covered in substance by the other final instructions given by the trial court.